COMMONWEALTH of Pennsylvania, Appellee

v.

**Ted Allan SHANK, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 31, 2005.
Filed Sept. 12, 2005.

---

659

Patrick Lavelle, DuBoise, for appellant.

Jeffrey D. Burkett, Assistant District Attorney, Brookville, for Com., appellee.

Before: LALLY–GREEN, POPOVICH, and JOHNSON, JJ.

JOHNSON, J.

¶ 1 Ted Allan Shank appeals the judgment of sentence imposed following his conviction of First–Degree Murder, Kidnapping, Aggravated Assault, Robbery, and Conspiracy. *See* 18 Pa.C.S. §§ 2501, 2901(a), 2702(a)(1), 3701(a)(1), 903. Shank contends that the Commonwealth adduced insufficient evidence to sustain his convictions, and that the trial court erred in allowing hearsay testimony and expert testimony beyond the scope of the expert's report. Shank argues in addition that both of his convictions for aggravated assault should have merged with the murder conviction as a matter of law. We find Shank's contentions without merit and, accordingly, we affirm the judgment of sentence.

¶ 2 This matter concerns Shank's brutal killing of Richard Gemmil following a disagreement over a game of pool at a bar in Punxsutawney. Both men wagered on the game and when Gemmil ultimately won, the two quarreled and Shank broke his pool stick. After Shank, along with co-conspirators Randy Shank, Doug Christner, and Shannon Dobson, were ejected from the bar, they determined to avenge the loss and, accordingly, hatched a scheme to draw Gemmil and his friend outside to confront them and continue the altercation. Accordingly, the foursome agreed that Dobson, the only woman in the group, would telephone the bar posing as Shank's wife and call Gemmil to the phone to report that Shank had beaten her and that she needed help. Dobson called the bar, apologized for Shank's belligerent conduct, and asked Gemmil to meet her in the parking lot of the County Market. Gemmil agreed to do so and went to the parking lot with his friend. When they arrived, Dobson told them that Shank and the other two conspirators were behind the market where, unbeknownst to Gemmil, Dobson had left them to await her return. Gemmil's friend left the scene, while Gemmil got into Dobson's car and rode with her into the alley behind the County Market. While in the car, he told Dobson that he had a knife and would protect her. Dobson did not stop behind the County Market, but instead drove to the rear of the B & H Tire warehouse. She then alighted from the car and told Gemmil that she was going to relieve herself. When Gemmil then exited the car, Shank and his co-conspirators assaulted him, knocking him unconscious and dragging him further into the alley, where they began to beat and kick him. As Christner struck him in the chest with a broom handle, Shank began kicking and stomping him in the head. As Gemmil lay unconscious, Shank continued uninterrupted for as long as one minute, administering kicks of such force that, as each blow was delivered, Gemmil's head

flew upward and then bounced back to the ground. Christner estimated that Shank placed six or seven such kicks. When the assailants left the scene, Shank took the victim's hat and Randy Shank took his wallet. As Dobson drove the assailants away, they removed the money from the wallet and then threw it out the car window along with the hat.

¶ 3 Sometime after their departure, Randy Shank and Doug Christner realized that the victim might be seriously injured, and suggested that the four return to the scene of the beating. When they arrived, Randy Shank approached the victim, who remained where his assailants had left him, and asked him if he was alright. Gemmil responded only inaudibly, prompting Randy to observe that he was "fucked up." Shank then approached the victim from across the parking lot and resumed kicking him in the head, again with such force as to cause his head to bounce up and strike the brick wall of the tire warehouse. Christner reported that he delivered at least four such kicks, and as he did so denounced the victim, saying "don't ever pull a knife on me again you fucking pussy." Sitting in her car, Dobson heard a thud as the victim's head struck the wall. Randy then remarked to her, "I think we need to take Ted home. He's flipping out."

¶ 4 After Dobson, Christner and Randy extracted the defendant from the assault and took him home, they returned again to the victim and found him dead. Frightened that the crime would be discovered if they left his body where it lay, they took him to a remote location along the roadside and threw the body over the guardrail down an embankment. After police recovered the body, an autopsy showed multiple external injuries consistent with blunt force trauma. The victim's tongue was clenched between his teeth, his skull was fractured, and his brain herniated and bleeding. The forensic pathologist, Dr. Vital Mittal, recorded the manner of death as homicide.

¶ 5 On August 19, 2004, the matter proceeded to jury trial before the Honorable John H. Foradora, P.J. Although Shank took the stand in his own defense, the jury returned a verdict of guilty on all charges after three days of testimony. At the subsequent sentencing hearing, Judge Foradora sentenced Shank to five to ten years' incarceration for Aggravated Assault, five to ten years' for Robbery, and four to eight years' for Kidnapping, all consecutive to each other and to life without parole for the murder conviction. Shank filed a motion for post sentence relief, which the court denied. Shank has now filed this appeal, raising the following questions for our review:

I. Whether the evidence of record is sufficient to sustain a conviction for 1st degree homicide when the record contains no independent evidence to support a finding of intent to kill, and the defendant and all the witnesses against him testified consistently that there was never an intent to kill the victim[?]

II. Whether the Commonwealth carried its burden to prove the defendant guilty of first degree murder when the record lacks sufficient admissible evidence to establish a causal link between the conduct of the defendant and the victim's death[?]

III. Whether the evidence adduced by the Commonwealth in this case is sufficient to establish all of the elements of the crime of robbery beyond a reasonable doubt[?]

IV. Whether the evidence adduced by the Commonwealth in this case is sufficient to establish beyond a

reasonable doubt that the victim was ever kidnapped[?]

V. Whether both of the convictions for aggravated assault should have merged with the homicide conviction for sentencing purposes when the support for the homicide conviction can only be found in the totality of the circumstances surrounding both encounters between the defendant and the victim[?]

VI. Whether the court erred when it admitted over objection the hearsay testimony of Shannon Dobson regarding statements made to her by others which attempted to establish the state of mind of the defendant[?]

VII. Whether the court erred when it denied all of the defendant's post trial motions without addressing the matters raised by defendant in his supplemental post-trial motion, when the supplemental motion raised serious issues regarding the credibility and veracity of the Commonwealth and its witnesses at the defendant's trial[?]

VIII. Whether the facts of the co-defendants'/Commonwealth witnesses' plea agreements and ultra lenient sentences, supposedly reached following the defendant's trial, support a reasonable inference of false or misleading trial testimony when the co-defendant's [*sic*] testimony at defendant's trial indicated that there was [*sic*] no prior discussions or agreements with the Commonwealth regarding any plea or sentence consideration, and further amounted to admissions of their complicity with the defendant in all of his conduct[?]

Brief for Appellant at 7–8.

¶ 6 Shank's first, third and fourth questions challenge the legal sufficiency of the evidence to sustain his convictions for murder in the first degree, Robbery, and Kidnapping, respectively. Because these claims are subject to the same standard and scope of appellate review, we will consider them together before addressing Shank's remaining claims.

Our standard of review of sufficiency claims requires that we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751 (2000). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Id.* Nevertheless, "the Commonwealth need not establish guilt to a mathematical certainty," *see Commonwealth v. Coon*, 695 A.2d 794, 797 (Pa.Super.1997), and may sustain its burden by means of wholly circumstantial evidence, *see Commonwealth v. Aguado*, 760 A.2d 1181, 1185 (Pa.Super.2000); *see also Commonwealth v. Murphy*, 795 A.2d 1025, 1038–39 (Pa.Super.2002) ("[T]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence."). Significantly, "[we] may not substitute [our] judgment for that of the factfinder; if the record contains support for the convictions they may not be disturbed." *Commonwealth v. Ostrosky*, 866 A.2d 423, 427 (Pa.Super.2005).

*Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa.Super.2005).

¶ 7 In Shank's first question, he challenges the sufficiency of the evidence to sustain his conviction for first degree murder, arguing that because the criminal information did not allege that he had poisoned the victim or lain in wait, the Commonwealth was required to demonstrate that he had intended to cause the victim's death. Brief for Appellant at 17. Shank argues further that although specific intent may be inferred from the use of a deadly weapon on a vital part of the victim's body, the record does not demonstrate that he used a deadly weapon. Brief for Appellant at 18. We find Shank's assertions without merit.

¶ 8 Homicide is defined only summarily by the governing statute. *See* 18 Pa.C.S. § 2501(a) ("A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being."). The following section, however, clarifies the respective degrees of the crime, based on the defendant's specific intent to achieve the result of his conduct. Hence, section 2502(a) provides that "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). The statute defines "intentional killing" as "[k]illing by means of poison, or by lying in wait or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). Our Supreme Court has elaborated that "[i]n first degree murder cases, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with deliberation." *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 500 (1997); *see also Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221, 1226 (1996) ("The Commonwealth must show: 1) that a human being has unlawfully been killed; 2) that the defendant did the killing; and 3) that the killing was done in a willful, deliberate and premeditated manner.").

¶ 9 The requirement of specific intent, proof of which Shank disputes, is more readily satisfied than his argument supposes.

> A well-recognized and generally accepted inference to establish state of mind is that an actor intends the natural and probable consequences of his acts. An offshoot of this principle is that a *specific intent to kill may be inferred from the use of a deadly force upon a vital part of the human body.*

*Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481, 485 (1980) (emphasis added). Such evidence, although circumstantial, may offer the only manifestation of the actor's intent. Thus,

> [w]here one does not verbalize the reasons for his actions, we are forced to look to the act itself to glean the intentions of the actor. Where the intention of the actor is obvious from the act itself, the finder of fact is justified in assigning the intention that is suggested by the conduct.

*Id. See also Hawkins*, 701 A.2d at 500 ("When there is no direct evidence of intent to kill, the fact-finder may glean the necessary intent from the act itself and from all surrounding circumstances."). Accordingly, "[i]f a deadly force is knowingly applied by the defendant to another, the specific intent to kill is as evident as if the defendant stated the intent to kill at the time the force was applied." *Smith*, 675 A.2d at 1226. In this context, the extent to which force may be deemed "deadly" is not merely a function of whether the defendant used a weapon, but rather, may be gauged by other factors including the seriousness and type of injury inflicted. *See Commonwealth v. Edmi-*

ston, 535 Pa. 210, 634 A.2d 1078, 1083 (1993), *overruled on other grounds, Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 410 (2003).

¶ 10 Adjudged by this standard, the evidence adduced in this case is more than sufficient to sustain Shank's conviction for first degree murder. Shank does not dispute that, at a minimum, he saw the victim sustain a severe beating during the first series of attacks. Christner testified that during this first encounter, the victim, already unconscious following punches to the head, sustained six or seven kicks to the head and face of such force that they caused his head to snap upward and then bounce back down, each time hitting the ground where he lay. N.T., 8/20/04, at 76–79. When Shank and his cohorts returned to the scene later, they found the victim in a debilitated state, slumped against the brick wall of the warehouse. N.T., 8/23/04 at 64. He was barely able to speak, his eyes were bruised and swollen, and his face was smeared with blood. N.T., 8/20/04, at 56–58. Significantly, notwithstanding Randy's admonition that the victim was already "fucked up," Shank resumed the attack, kicking his head into the wall at least four times with such ferocity that police investigators later found bits of blood and hair congealed on the bricks. N.T., 8/20/04, at 75–84. The victim offered no resistance.

¶ 11 We find these circumstances legally sufficient to establish Shank's specific intent to bring about the victim's death. Having witnessed and participated in the victim's initial beating, Shank was on notice that Gemmil's condition was extremely serious when the foursome returned to the scene. In point of fact, Shank's co-conspirators testified that their only reason for returning to the scene was the concern that the victim would need to go to a hospital. Given the evident severity of the victim's injuries when the group returned, Shank's brutal continued kicking of the victim's face and head stands witness to his specific intent. The results, documented in the report of medical examiner Dr. Vital Mittal, bear further witness, establishing that Shank employed force sufficient to fracture the victim's skull, causing the herniation and hemorrhage of his brain. There could be no more vital part of the victim's body, and Shank's unceasing attacks upon it support a finding of first degree murder. *See Hawkins,* 701 A.2d at 500–01 (finding evidence of manual strangulation sufficient to establish specific intent underlying first degree murder conviction); *Smith,* 675 A.2d at 1227 (concluding that fracture of infant victim's skull by at least five to seven distinct blows to the head demonstrated "willful, premeditated and deliberate killing"); *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 629–30 (1995) (finding evidence legally sufficient to sustain element of specific intent for first degree murder where forensic evidence showed that victim died from asphyxia due to strangulation, all of her ribs were broken and her spine showed blunt force trauma).

¶ 12 The evidence is similarly sufficient to sustain Shank's conviction for Robbery, which he challenges in his third question. Brief for Appellant at 30. The Pennsylvania Crimes Code prescribes the elements of Robbery as follows:

(a) **Offense defined.**—

(1) A person is guilty of robbery if, in the course of committing a theft, he:

  (i) inflicts serious bodily injury upon another;

  (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

  (iii) commits or threatens immediately to commit any felony of the first or second degree;

(iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury; or

(v) physically takes or removes property from the person of another by force however slight.

18 Pa.C.S. § 3701(a)(1).

¶ 13 Shank acknowledges that he was convicted as an accomplice but argues, nevertheless, that the evidence did not sustain the elements, as "to be an accomplice in the commission of a crime, [the defendant] must be a direct active partner in the **intent** to commit it." Brief for Appellant at 31. Shank contends that such "shared intent" is negated by the testimony of co-conspirators Doug Christner and Shannon Dobson that it was Randy Shank, and not he, who reached into the victim's pocket and stole his wallet. Brief for Appellant at 32–33. He concludes that "[t]here is simply no evidence in this record upon which a jury could conclude beyond a reasonable doubt that this defendant, or anyone other than Randy Shank, ever gave the slightest thought to stealing anything from the victim." Brief for Appellant at 33. We find this claim without merit.

■■■ ¶ 14 We recognize that a defendant's association with the perpetrators of a crime, his presence at the scene of the crime, or his knowledge that a crime is being committed are not sufficient to establish his complicity in that crime. *See Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1234 (2004). "There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so." *Id.* Such aid need not be substantial, however, and will be sufficient to establish the requisite shared intent "so *long* as it was offered to the

principal to assist him in committing or attempting to commit the crime." *Id.*

¶ 15 Testimony in this case, which the factfinder was free to accept as true, is more than sufficient to meet this benchmark. In the Commonwealth's case in chief, Christner offered the following recollection:

Q. All right. Now, after you left the bar, what happened?

A. When we went and got in the car, we was going to wait for the two gentlemen to come outside, and we pulled in the parking lot across from Cookie's Caboose.

   *    *    *    *    *    *

Q. What happened when you were going to the car?

A. Everybody was hyped up for getting kicked out of the bar; and Ted was mad because he won the game, and he didn't get the money from [the victim].

   *    *    *    *    *    *

Q. And was there anything further discussed?

A. Well, after we got inside the car and pulled across the road waiting for them to come out, we were just expecting to get into a fight.

Q. Was there any talk about money?

A. Yes.

Q. What was that talk?

A. Ted said he won the game and wanted to fuck him up to pay.

N.T. 8/20/04, at 72–73. This testimony, offered without objection, suggests that Shank's motive, from the very inception of the conflict, was to collect by force on a debt that he believed the victim owed him. With the help of the others, he then beat the victim so seriously as to eliminate any prospect of resistance when Randy Shank or any of the others chose to take his

property. Consequently, the fact that Randy Shank, rather than the defendant, physically removed the victim's wallet from his pocket is of little consequence to the defendant's conviction as an accomplice. His conduct prior to the actual theft of the victim's money is ample to demonstrate his "shared intent" to commit robbery. *See Commonwealth v. Mills,* 332 Pa.Super. 75, 480 A.2d 1192, 1195–96 (1984) (finding evidence legally sufficient to sustain accomplice liability for robbery where defendant entered victim's motel room brandishing knife while co-perpetrator took victim's wallet and keys and put them in her purse).

¶ 16 In his fourth question, Shank challenges the sufficiency of the evidence to sustain his conviction for Kidnapping. Brief for Appellant at 34. The elements of Kidnapping are prescribed by the Crimes Code as follows:

**§ 2901. Kidnapping**

**(a) Offense defined.**—A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

(1) To hold for ransom or reward, or as a shield or hostage.

(2) To facilitate commission of any felony or flight thereafter.

(3) To inflict bodily injury on or to terrorize the victim or another.

(4) To interfere with the performance by public officials of any governmental or political function.

**(b) Grading.**—Kidnapping is a felony of the first degree. A removal or confinement is unlawful within the meaning of this section if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14

years or an incapacitated person, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.

18 Pa.C.S. § 2901.

■ ¶ 17 Shank contends that the evidence failed to establish his guilt because the ruse employed by Shannon Dobson to entice the victim into her car did not rise to the level of deception required to substitute for force or threat under the foregoing provision. Brief for Appellant at 35–36. Shank argues that the deception used must be such as to overcome the victim's free will, to be the actual cause of the victim's movement. Significantly, Shank fails to cite case authority to support the rule of law he asserts. We conclude that the language of the statute does not support his interpretation.

¶ 18 Shank's theory appears to rely on the language of the grading provision of the kidnapping statute, *see* 18 Pa.C.S. § 2901(b), which also appears to prescribe additional elements of the crime. The operative language allows that "a removal or confinement is unlawful within the meaning of the section if it is accomplished by force, threat or deception ...." *Id.* (emphasis added). This construction is disjunctive; *i.e.,* it employs the conjunction "or" to delineate circumstances under which "removal or confinement" is unlawful. Thus, it allows that *any* of the three elements enumerated; i.e., force, threat *or* deception, may establish the unlawfulness of "removal or confinement." *Cf. Commonwealth v. Gerulis,* 420 Pa.Super. 266, 616 A.2d 686, 693 (1992) ("When a criminal statute criminalizes two separate actions or intents, the Commonwealth need only prove one."); *see also Commonwealth v. Persichini,* 558 Pa. 449, 737 A.2d 1208, 1213 n. 6 (1999) (reasoning that "because

of the disjunctive language" of the statute at issue, the Commonwealth might have proceeded with either of two measures of guilt). The statute does not require that one element be of such caliber as to "substitute" for another, as Shank contends; nor does it require that any level of force or threat be shown. *See Gerulis*, 616 A.2d at 693 (" 'Or' can only be construed to mean 'and' when to give the word 'or' its ordinary meaning would be to produce a result that is absurd or impossible of execution or highly unreasonable or would manifestly change or nullify the intention of the legislative body."). Accordingly, we find Shank's argument untenable as a matter of law.

¶ 19 Moreover, although Shank disputes the adequacy of the evidence of "deception" on which the Commonwealth relied, he fails to acknowledge that the victim's path into harm's way was paved entirely with Dobson's falsehoods. In the absence of Dobson's lies concerning her purported marital distress, the victim would not have met her at the County Market, and certainly would not have ventured with her behind the B & H Tire warehouse. The fact that he accompanied Dobson willingly, recognizing that he might face hostility from her putative husband in no way negates the fact that his only motivation to go with her rested on the false pretense that she needed protection. Although one might debate the wisdom of the choice the victim made, the fact remains that he acted on the basis of false information in an effort to address a threat to Dobson's safety that did not exist. Accordingly, we find no merit in Shank's assertion that the lies Dobson told were not sufficient to overcome the victim's free will; indeed, without them the victim would have had no occasion to make the choice he made to follow Dobson to his death. Consequently, we find the

evidence legally sufficient to sustain Shank's conviction as an accomplice to kidnapping. *See Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, 619 (2001) (finding evidence legally sufficient to sustain kidnapping conviction based on deception where defendant lured victim to the place of her death by asking her to meet him there to discuss her availability for a secret government job he had offered but that did not exist).

¶ 20 Returning to Shank's questions in the order presented, we now address his second question, which challenges his conviction of first degree murder on grounds that the testimony of pathologist Vital Mittal, M.D., which established a causal link between Shank's conduct and the victim's death, was inadmissible. Brief for Appellant at 19. Shank argues that Dr. Mittal's testimony was beyond the scope of his autopsy report, and contends that had he had advance notice of the expert's specific testimony of the kinds of blows that took the victim's life, he could have introduced the presumably countervailing testimony of another expert. Brief for Appellant at 22–24. Before considering its merits, however, we note that Shank's question is waived by virtue of his failure to lodge an appropriate and timely objection with the trial court. Although we acknowledge, as Shank asserts, that he posited an objection during Dr. Mittal's testimony after Mittal attempted to use a diagram he had drawn before coming to court, we find no basis on which to extend that objection to other potentially objectionable occurrences or statements during his testimony. Considered in context, which we do not reproduce here due to its extended length, Shank's objection appears to relate only to the use of the diagram:

Your Honor, if I may, Dr. Mittal submitted a report in this particular case. I would object at this point [to] any comment by the doctor with respect to any of the injuries that are not covered by his report. I will object to the document [the diagram] as being beyond the scope. The rule clearly states that the expert is limited to that scope.

N.T., 8/20/04, at 53. Although some of the objection's broad language might suggest application to some aspect of the doctor's testimony other that the diagram itself, the Commonwealth did not elicit the "mode of injury" testimony with which Shank takes issue until well after Shank registered this objection. N.T., 8/20/04, at 56–58. Stated differently, Shank attempts to preserve his claim of trial court error based on an objection he made in anticipation of testimony before that testimony was ever offered. The Pennsylvania Rules of Evidence appear to limit the extent to which litigants may seek to preserve issues in this way. Rule 103 provides that "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless ... [i]n case the ruling is one admitting evidence, a timely objection, motion to strike or motion in limine appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]" Pa.R.E. 103(a)(1). The Rule's official comment amplifies the necessity of motions *in limine* as the appropriate means to challenge admission of evidence. Distinguishing Rule 103(a)(1) and (2) from its federal counterpart, F.R.E. 103, the committee explained that:

> Paragraphs (a)(1) and (a)(2) are similar to F.R.E. 103(a)(1) and (a)(2). The term "motion *in limine*" has been added and the last three words have been changed. Motions *in limine* permit the trial court to make rulings on evidence prior to trial or at trial but before the evidence is offered. Such motions can expedite the

trial and assist in producing just determinations. A ruling on a motion *in limine* on the record is sufficient to preserve the issue for appeal, without renewal of the objection or offer at trial. The change in language is intended to make clear that the requirement that offers of proof be made is applicable to testimonial and other types of evidence.

Pa.R.E. 103, Comment. In this instance, Shank did not file a motion *in limine* seeking exclusion of the expert's testimony concerning mode of injury. This omission is critical.

¶ 21 Moreover, to the extent his objection at trial might be deemed to apply, it is markedly premature. Although objections to *competence* are routinely made prior to the witness's testimony, *see* Pa.R.E. 601(b), we are aware of no authority that extends this rule to substantive testimony where no motion *in limine* has been field. Indeed, such a rule or practice might effectively allow counsel to record blanket objections prior to presentation of any evidence, based merely upon his expectations of matters that his opponent might present. As our Rules of Evidence establish, the ability of the trial judge to rule expeditiously and correctly is premised on the timeliness of the objection upon which he is called to rule. *See generally* Pa.R.E. 103(a)(1). No court can assume counsel's duty to correlate his objections with the testimony to which they apply. Because an objection cannot be deemed to extend to testimony that has not yet been presented, and because Shank offered no objection during Dr. Mittal's testimony concerning the "mode of injury," we deem the challenge raised in this question to be waived.

¶ 22 In his fifth question, Shank challenges the legality of the court's decision to impose separate sentences for his con-

victions of Aggravated Assault and first degree murder. Brief for Appellant at 41. Shank argues that "support for the homicide conviction can only be found in the totality of the circumstances surrounding both encounters between the defendant and the victim," and concludes accordingly that both of his convictions for Aggravated Assault should merge with his murder conviction. Brief for Appellant at 41, 44. This conclusion is mandated, he contends because the respective convictions arose out of the "same facts." Brief for Appellant at 44. Although the trial court allowed merger of the Aggravated Assault conviction arising from the second attack, it refused merger for the first attack. We find no error in the trial court's disposition of this issue.

¶ 23 To support his claim, Shank relies on our Supreme Court's plurality decision in *Commonwealth v. Gatling*, 570 Pa. 34, 807 A.2d 890 (2002). In *Gatling*, Justice Newman reaffirmed and clarified the law of merger as stated in the Court's prior jurisprudence. *Id.* at 899.

> The preliminary consideration is whether the facts on which both offenses are charged constitute one solitary criminal act. If the offenses stem from two different criminal acts, merger analysis is not required. If, however, the event constitutes a single criminal act, a court must then determine whether or not the two convictions should merge. In order for two convictions to merge: (1) the crimes must be greater and lesser-included offenses; and (2) the crimes charged must be based on the same facts. If the crimes are greater and lesser-included offenses and are based on the same facts, the court should merge the convictions for sentencing; if either prong is not met, however, merger is inappropriate.

*Id.* This pronouncement states the current law of this Commonwealth concerning the merger doctrine. *See Commonwealth v. Anderson*, 538 Pa. 574, 650 A.2d 20, 22 (1994) (citing *Commonwealth v. Leon Williams*, 521 Pa. 556, 559 A.2d 25 (1989)). Shank appears to ground his argument, however, on *Gatling's* further conclusion that

> an overarching chain of events does not constitute a single criminal act when there is a break in that chain. A break requires both that: (1) the acts constituting commission of the first crime were completed before the defendant began committing the second crime; and (2) proof of the second crime did not in any way rely on the facts necessary to prove the first crime.

*Gatling*, 807 A.2d at 900. From this formulation, Shank extrapolates that because some of his actions in kicking the victim during the first assault may have contributed to the victim's death following the second assault, all of the acts must be characterized as a single criminal episode for which he may be sentenced for only the greater offense, *i.e.*, murder in the first degree. Brief for Appellant at 43–44.

¶ 24 Significantly, however, *Gatling's* discussion of factors determining a "break in the chain" did not command a majority of the Court and, as we have since recognized, is not precedential. *See Commonwealth v. Healey*, 836 A.2d 156, 158 (Pa.Super.2003); *see also Gatling*, 807 A.2d at 901 (Saylor, J. concurring) ("I have difficulty subscribing to the lead's "break-in-the-chain" test, however, since this issue of distinctness is best assessed according to the totality of the circumstances, and the discrete factors described by the opinion announcing the judgment of the court are open to subjective interpretation and may be difficult to definitively resolve, particularly where, as here, the offenses upon

which multiple punishments are to be predicated occurred in close proximity in time and location.").

¶ 25 Accordingly, we rely on caselaw predating *Gatling* to delineate when more than one criminal episode may be deemed to occur: "If ... the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes." *Commonwealth v. Belsar*, 544 Pa. 346, 676 A.2d 632, 634 (1996) (quoting *Commonwealth v. Weakland*, 521 Pa. 353, 555 A.2d 1228, 1233 (1989), *overruled on other grounds, Commonwealth v. Anderson*, 538 Pa. 574, 650 A.2d 20, 22 (1994)). "When a criminal act has been committed, broken off, and then resumed, at least two crimes have occurred and sentences may be imposed for each. To hold that multiple assaults constitute only one crime is to invite criminals ... to brutalize their victims with impunity." *Belsar*, 676 A.2d at 634. "[S]o long as the crimes are not greater or lesser included offenses, [defendants] are liable for as many crimes as they are convicted of and may be sentenced for each such crime." *Anderson*, 650 A.2d at 22.

¶ 26 Based on this formulation, we conclude that a confluence of facts, some of which are common to a defendant's multiple offenses, does not preclude a finding of multiple criminal episodes, and may compel imposition of distinct sentences for multiple related counts. Consistent with this reasoning, our Supreme Court determined in *Belsar* that where the defendant shot the victim and later returned and kicked him as the victim tried to crawl away, the aggravated assault conviction that followed could not merge with the attempted murder conviction that arose from the shooting. 676 A.2d at 634. The

Court reasoned that because the later act of kicking was temporally distinct from the act of shooting and additional to it, each conviction was supported by a distinct basis in fact. *See id.* The Court determined accordingly that merger was not appropriate. *See id.*

¶ 27 The same analysis is apposite here. Undisputed testimony from all of the witnesses shows that the attack underlying Shank's convictions occurred in two temporally distinct parts. The first portion of the attack, during which Randy Shank and Doug Christner joined the defendant to waylay the victim as he got out of Dobson's car, left the victim unconscious and injured, but alive. The attack resumed only after the perpetrators left the scene and then returned sometime later, ostensibly to assure that the victim received appropriate medical treatment. During that second timeframe, Shank acted alone, delivering a brutal series of kicks that left the victim lifeless. Because these events are readily divisible in time and gave rise to distinct and identifiable consequences, they are subject to separate conviction and sentence. *See Belsar*, 676 A.2d at 634 (determining that "where the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes"). Thus, while Shank's conviction for Aggravated Assault arising from the second attack properly merges with his conviction for murder, the conviction attributable to the first attack may not and remains distinct for sentencing purposes. The trial court did not err in so holding.

¶ 28 In his sixth question, Shank challenges the trial court's admission of testimony by Dobson which repeated statements others had made concerning

Shank's state of mind during the resumed attack. Brief for Appellant at 45. Dobson testified that, as she sat in the car, Randy Shank, after checking the victim's condition, returned and said, "I think we need to take Ted [the defendant] home, he's flipping out." Brief for Appellant at 46. Shank objected to the testimony on grounds of hearsay, but the trial court deemed it admissible as a present sense impression. Significantly, Shank now argues that admission of the statement was prejudicial because its content, specifically the phrase "flipping out" is inherently ambiguous, and its admission encouraged the jury to speculate about Shank's state of mind. Brief for Appellant at 48. However, upon review of the record, we note that at no time did Shank present this argument to the trial court as the basis for his objection. This omission is fatal.

¶ 29 Our Rules of Evidence circumscribe the extent to which erroneous evidentiary rulings may be treated as sources of reversible trial court error. Rule 103 states expressly that: "Error may not be predicated upon a ruling that admits or excludes evidence unless ... [i]n case the ruling is one admitting evidence, a timely objection, motion to strike or motion in limine appears of record, *stating the specific ground of objection,* if the specific ground was not apparent from the context." Pa.R.E. 103(a)(1) (emphasis added). As a corollary to the rule, our Courts have long recognized that "[w]here a specific objection is interposed, other possible grounds for the objection are waived." *Commonwealth v. Witherspoon,* 481 Pa. 321, 392 A.2d 1313, 1314 n. 4 (1978); *see also Commonwealth v. McMillan,* 376 Pa.Super. 25, 545 A.2d 301, 308 (1988) ("When a specific objection to the admission of evidence is made at trial, all other reasons for excluding the evidence are waived."). In this instance, the application of these rules precludes our consideration of the merits of Shank's question, as nowhere in his objection did he posit the reason he now attempts to advance. Accordingly, we deem this sixth question waived. *See id.*

¶ 30 In his seventh question, Shank originally challenged the trial court's failure to address the claims he raised in a supplemental post-sentence motion. Brief for Appellant at 49. Shank now acknowledges, however, that the trial court did address those claims in its Rule 1925(a) opinion. Accordingly, he concedes that his seventh question is moot as stated, and directs our attention to his eighth question, which challenges the trial court's disposition of the merits of the supplemental issues.

¶ 31 In his eighth question, Shank appears to attack both the credibility of his co-conspirators, who testified against him, and the integrity of the prosecutor whom, he contends, must have reached an agreement with the co-conspirators but did not disclose it before trial. Brief for Appellant at 49–50. Shank appears to base that conclusion on the fact that although the co-defendants testified at trial that they had not reached a deal with the Commonwealth, in exchange for their testimony, either express or implied, they later pled guilty to lesser charges and received lesser sentences. The substance of the argument follows:

If there had been a hint of a deal between the co-defendants and the District Attorney, it would have been perfectly clear to the jury that the only reason the co-defendants were testifying was to avoid the ramifications of a homicide conviction. If such were the case, then of course the co-defendants would be motivated to point the finger at Ted Alan Shank, the first to go to trial, and

support the Commonwealth's theory of the case.

It is also clear, from all of the foregoing that the District Attorney intended at all times to give the jury the impression that the co-defendants, regardless of their apparent cooperative testimony, would be held to answer for their involvement in the death of the victim. Nothing could have been further from the truth.

It is clear, based upon the circumstances occurring after the fact, that there was some indication given to the co-defendants by the District Attorney via some method, surreptitious or otherwise, which implied that they would be rewarded for their cooperation and testimony.

Brief for Appellant at 52–53.

¶ 32 We find this argument insupportable and ill-considered. Operating merely on a series of inferences that do not necessarily follow from the circumstances alleged, Shank offers no substantiation for his far-reaching claims and ignores the fact that all evidence of record demonstrates that his co-defendants were far less culpable than he in causing the victim's death. Regardless of the arrangements the co-defendants reached *after trial,* the fact remains that all of the evidence adduced *at trial* (with the exception of Shank's own tendentious testimony) demonstrated that Shank assumed the lead role in the victim's death. Assailing the motive and integrity of the district attorney does not alter that reality.

¶ 33 For the foregoing reasons, we affirm Shank's judgment of sentence.

¶ 34 Judgment of sentence AFFIRMED.