J-S38022-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                      :            PENNSYLVANIA
                                       :
             v.                          :
                                         :
LEO A. GARDNER,                      :
                                         :
             Appellant              :    No. 2891 EDA 2018

Appeal from the Judgment of Sentence Entered August 16, 2018
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0001172-2017

BEFORE: OTT, J., DUBOW, J., and COLINS*, J.

MEMORANDUM BY DUBOW, J.:             **FILED AUGUST 13, 2019**

Appellant, Leo A. Gardner, appeals from the Judgment of Sentence entered in the Monroe County Court of Common Pleas on August 16, 2018, following his jury conviction of Attempted Murder, Aggravated Assault, Terroristic Threats, and Simple Assault.[1] On appeal, Appellant challenges the weight of the evidence and an evidentiary ruling. After careful review, we affirm.

The Commonwealth charged Appellant with, *inter alia*, the above crimes following his violent attack of Brittany Seitz. Appellant's two-day jury trial commenced on June 19, 2018.

At trial, the Commonwealth presented the testimony of a number of witnesses including eyewitnesses Hericson Torres, Brandon Caron, and State

_____

[1] 18 Pa.C.S §§ 901(a)—2501; 2702(a)(1); 2706(a)(1); and 2701(a)(3), respectively.

_____

* Retired Senior Judge assigned to the Superior Court.

Troopers Anthony Paciotti and Ian MacMillan. Appellant presented the testimony of an investigator, Joseph Alercia, and also testified on his own behalf, asserting that he had been acting in self-defense.

We glean the following relevant facts from our review of the record, including the trial court's Pa.R.A.P. 1925(a) Opinion. Appellant and Brittany Seitz spent April 26, 2017, together ingesting drugs, including methamphetamine, and driving around Monroe County. Late that evening, or in the early hours of April 27, 2017, Ms. Seitz pulled her car over to the side of the road, whereupon she and Appellant engaged in a physical altercation.[2]

Hericson Torres's testimony revealed that, in the early morning hours of April 27, 2017, his wife woke him after she heard a female screaming outside their home. Mr. Torres testified that he walked outside and heard a female voice screaming for help. At around 3:30 AM, he went to investigate the voice, bringing with him a flashlight, a tee-ball bat, and a knife.

Brandon Caron testified that he also left his home in the early hours of that morning to investigate after hearing a female voice yell, "Help. He's killing me." He testified that when he arrived he found Appellant on top of Ms. Seitz, dragging her into the woods, biting her, with his fingers in her eyes. Ms. Seitz was lifeless, and Mr. Caron testified that he believed she was dead. Mr. Caron further testified that he yelled at Appellant to stop, and Appellant

_____

[2] In Appellant's version of events, Ms. Seitz instigated the altercation; in the Commonwealth's version, Appellant was the instigator.

responded by stating something akin to "get out of here. I stabbed her in the throat . . . I slit her throat . . . get out of here or I'll kill you too."[3]

Mr. Torres testified that, when he arrived on the scene, Mr. Caron reported that Appellant was eating Ms. Seitz, and that, due to the darkness, Mr. Torres thought Appellant may actually have been a bear. Mr. Torres also testified that he thought Ms. Seitz was dead.

The testimony indicated that Mr. Torres and Mr. Caron attempted to stop Appellant by hitting, pushing, and kicking him. Their efforts were, however, unsuccessful. Instead, Appellant warned them to mind their own business and threatened to kill them.

At approximately 4:00 AM, Troopers Anthony Paciotti and Ian McMillan arrived at the scene. They observed Appellant continue to attack Ms. Seitz while she lay lifeless on the ground. Trooper Paciotti saw Appellant on his hands and knees on top of Ms. Seitz, with his face in contact with Ms. Seitz's face. Appellant refused Trooper Paciotti's command to get off Ms. Seitz. Trooper Paciotti proceeded to kick Appellant off Ms. Seitz. Trooper Paciotti observed that Appellant was naked except for his underwear and incoherent.

Once they removed Ms. Seitz from the scene, the troopers observed that Appellant had partially amputated Ms. Seitz's nose, and she had sustained multiple bruises and bites. Both of her eyes were swollen shut. They transported her to the hospital. Troopers also took Appellant to the hospital

---

[3] **See** N.T., 6/19/18, at 75.

where doctors treated him for a collapsed lung, head trauma, broken bones, and multiple stab wounds. Lab tests revealed that Appellant had toxic levels of methamphetamine in his blood.

In his case-in-chief, Appellant claimed that he had been acting in self-defense. In support of this claim, Appellant sought to introduce evidence of Ms. Seitz's alleged propensity for violence. This evidence included excerpts of a personal Facebook page Appellant alleged belonged to Ms. Seitz.[4] In particular, the proffered Facebook posts included a statement, allegedly posted by Ms. Seitz two days prior to this incident, that "if she killed someone it would be her psychiatrist's fault." N.T., 6/20/18, at 46. The post also contains an admission by the author that "she has post-traumatic stress disorder and anxiety . . . and she takes psychiatric mediation[.]" *Id.* at 47.

To authenticate the Facebook page, Appellant presented the testimony of Joseph Alercia, an investigator who had previously met with Ms. Seitz about another case where she was a complaining witness.[5, 6] Outside the presence

---

[4] Appellant proffered this evidence to demonstrate Ms. Seitz's state of mind and her propensity for violence. *See* N.T., 6/20/18, at 46, 49.

[5] Appellant also intended for Mr. Alercia to testify about Ms. Seitz's reputation in the community for violence to support Appellant's self-defense claim. *See* N.T., 6/20/18, at 40-41.

[6] Ms. Seitz did not attend Appellant's trial and her whereabouts were unknown at that time. Ms. Seitz could not, therefore, testify that she had authored the Facebook post at issue.

of the jury,[7] Mr. Alercia testified that he was familiar with Ms. Seitz and knew that she had a psychiatric diagnosis for which she takes prescription medication, although he did not indicate how he knew this information about Ms. Seitz. He further testified that he was familiar with Ms. Seitz's Facebook page, and that the photographs of the woman associated with the Facebook page Appellant sought to introduce as evidence were photographs of Ms. Seitz. He also testified that the Facebook page indicates that its owner is: (1) located in the East Stroudsburg area, which is where Ms. Seitz lives; (2) is originally from New York, which is where Ms. Seitz originates; and (2) went to the same high school as Ms. Seitz.

On cross-examination, Mr. Alercia admitted that he did not know that there were 11 Facebook accounts whose owners were named "Brittany Seitz." He conceded that he had never met Ms. Seitz and that she had not admitted to authoring the post Appellant sought to admit as evidence. He also conceded that he did not obtain an IP address, email address, or password for the Facebook account at issue.

Relying on *Commonwealth v. Mangel*, 181 A.3d 1154 (Pa. Super. 2018), the trial court found Appellant's authentication efforts insufficient to

---

[7] The trial court characterized this as "technically[] a motion in *limine* as to whether or not [the court would] allow evidence here from this witness about a Facebook post of the victim in this case." N.T., 6/20/18, at 50.

establish that the Facebook account in question belonged to Ms. Seitz, the victim.[8] Thus, the trial court precluded admission of this evidence.

Appellant testified on his own behalf. He claimed that Ms. Seitz had initially instigated the altercation between them and had stabbed him in the back.

The jury did not credit Appellant's claim that he was acting in self-defense when he attacked Ms. Seitz. It returned a guilty verdict on June 21, 2018. On August 16, 2018, the trial court sentenced Appellant to serve an aggregate term of 12½ years less one day to 25 years less one day of incarceration.

On August 23, 2018, Appellant filed a Post-Sentence Motion challenging the weight of the evidence and the discretionary aspects of his sentence. The trial court denied the Motion on August 28, 2018.

This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues on appeal:

_____

[8] In **Mangel**, 181 A.3d 1154 (Pa. Super. 2018), this Court affirmed the trial court's order denying the Commonwealth's motion in *limine* where the Commonwealth's computer forensics expert testified that she had located only one Facebook account bearing the defendant's name and that this Facebook profile matched screenshots of messages attributed to the defendant, listed the defendant's home town and school, and was registered to an email address and phone number attributable to the defendant. *Id.* at 1156-57. On cross-examination, however, the expert admitted that she did not obtain an IP address for the account and that there were, in fact, five accounts bearing the same name. *Id.* at 1157.

1. Should the [c]ourt have admitted a statement on the alleged victim's Facebook page stating that "if she killed someone, it would be her psychiatrist's fault," in a case where self-defense was argued by [Appellant], and [Appellant] called a witness to testify that he was familiar with the victim's Facebook page?

2. Was the jury's verdict finding [Appellant] guilty of Attempted Murder against the weight of the evidence?

Appellant's Brief at 6.

In his first issue, Appellant claims that the trial court erred in excluding on authentication and relevance grounds an excerpt from a Facebook account purportedly owned by Ms. Seitz that Appellant alleges demonstrates Ms. Seitz's propensity for violence.[9] *Id.* at 16-19.

"When reviewing a trial court's denial of a motion in *limine*, this Court applies an [ ] abuse of discretion standard of review." ***Commonwealth v. Schley***, 136 A.3d 511, 514 (Pa. Super. 2016). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where

_____

[9] The content of the Facebook post is as follows:

> I got absolutely no sleep last night… And I feel like complete dog shit. I'm gonna fucking lose it… I'm sick of being miserable cause my [piece] of shit psych stopped my meds and he saw me for the first fucking time didn't talk to me at all… All he fucking did was completely stop my fucking meds… So if I lose my fucking mind and kill someone it would be on them… I'm sick of being fucking miserable I can't fucking sleep and my anxiety and ptsd is out of fucking control now … I hope someone [wakes] the fuck up time and shoots me in the fucking face!!! At least then I wouldn't have to deal with fucking asshole who don't know how to do [their] fucking job!!!

Appellant's Brief at Exhibit A.

the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." ***Id.*** (citation omitted).

Relevance is the threshold for admissibility of evidence. ***Commonwealth v. Cook***, 952 A.2d 594, 612 (Pa. 2008). Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Pa.R.E. 401; ***Commonwealth v. Serge***, 896 A.2d 1170, 1177 (Pa. 2006). "Evidence that is not relevant is not admissible." Pa.R.E. 402.

Additionally, pursuant to Pennsylvania Rule of Evidence 901, authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. ***See*** Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. ***See*** Pa.R.E. 901(b)(1). Evidence that cannot be authenticated by a knowledgeable person, pursuant to subsection (b)(1), may be authenticated by other parts of subsection (b), including circumstantial evidence pursuant to subsection (b)(4). ***See*** Pa.R.E. 901(b)(4).

The "authentication [of] social media evidence is to be evaluated on a case-by-case basis to determine whether or not there has been an adequate foundational showing of its relevance and authenticity." ***Mangel***, 118 A.3d at 1162. Moreover, "the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the author

of the communication in question, such as testimony from the person who sent or received the communication, or contextual clues in the communication tending to reveal the identity of the sender." *Id.*

In support of his authentication claim, Appellant argues that the Facebook statement itself offers "contextual clues" that Ms. Seitz was its author. *Id.* at 16-17. He also argues that his testimony that he saw Ms. Seitz take prescription medication he believed was for her psychiatric diagnosis throughout the day that he attacked her, and that Ms. Seitz was on the phone with her doctor and upset about her medication, provides "context" to authenticate that Ms. Seitz had written the Facebook post. *Id.* at 16-17. According to Appellant, Ms. Seitz's medical records, which the court admitted into evidence, reflecting her anxiety, bipolar, and post-traumatic stress disorder diagnoses, also provided authenticating evidence. *Id.* at 17. Last, Appellant argues that Mr. Alercia's testimony authenticated the post. *Id.*

Appellant also asserts that this Facebook post is relevant to his self-defense claim because it proves that Ms. Seitz had a propensity for violence. *Id.* at 18. In particular, Appellant avers that this post supports his claim that Ms. Seitz instigated the altercation between them, and that Appellant bit her only after she had stabbed him in the back. *Id.* at 18-19.

The Honorable David J. Williamson, who presided over Appellant's trial, has authored a comprehensive, thorough, and well-reasoned Opinion, citing to the record and relevant case law in addressing Appellant's claim. *See* Trial Court Opinion, 11/28/18, at 18-21 (finding: (1) Appellant's witness's

testimony was insufficient to authenticate the Facebook post; (2) the Facebook post was not relevant evidence of Ms. Seitz's propensity for violence because it constituted "more of a statement than a threat;" and (3) contrary to Appellant's contention, the Facebook post was not essential to Appellant's self-defense claim). Our review of the record, including the Notes of Testimony from Appellant's trial, supports the trial court's conclusion. We, thus, conclude that the trial court did not abuse its discretion in excluding the proffered evidence, and we affirm on the basis of the trial court's Opinion.

In his second issue, Appellant contends that the jury's guilty verdict on the Attempted Murder charge was against the weight of the evidence. Appellant's Brief at 19-21. He argues that the Commonwealth failed to present evidence that Ms. Seitz's injuries were life threatening; therefore, Appellant's conviction for Attempted Murder for biting off Ms. Seitz's nose shocks the conscience. *Id.* at 20. Rather, he claims that the "un-contradicted evidence from trial was that [Appellant] bit her in order to prevent Ms. Seitz from stabbing him to death." *Id.*

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (quotation marks and citation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.

Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra* at 546.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.* at 545-46. "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is [or is not] against the weight of the evidence." *Id.* at 546. "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id.*

Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (internal quotation marks and citation omitted). As our Supreme Court has made clear, reversal is only appropriate "where the facts and inferences disclose a palpable abuse of discretion[.]" *Commonwealth v. Morales*, 91 A.3d 80, 91 (Pa. 2014) (citations and emphasis omitted).

"[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be

believed." ***Commonwealth v. Thompson***, 106 A.3d 742, 758 (Pa. Super. 2014). For that reason, the trial court need not view the evidence in the light most favorable to the verdict winner, and may instead use its discretion in concluding whether the verdict was against the weight of the evidence. ***Commonwealth v. Widmer***, 744 A.2d 745, 751 n.3 (Pa. 2000).

Instantly, the jury credited the testimony of the Commonwealth's witnesses over Appellant's testimony that he was acting in self-defense. Appellant essentially asks this Court to reassess the credibility of the Commonwealth's witnesses and Appellant, and reweigh the testimony and evidence presented at trial. We cannot and will not do so. Our review of the record shows that the evidence is not tenuous, vague, or uncertain, and the verdict was not so contrary as to shock the court's conscience. Accordingly, we discern no abuse of discretion in the trial court's denial of Appellant's weight claim.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/19

- 12 -

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA : NO. 1172 CRIMINAL 2017
:
vs. :
:
LEO GARDNER, :
:
Defendant : PA. R.A.P. 1925(a)

## STATEMENT PURSUANT TO PA. R.AP. 1925(a)

The Defendant, Leo Gardner, was convicted by a jury on June 20, 2018 of various offenses following trial. The Defendant was convicted of Count I, Attempted Criminal Homicide, action resulting in serious bodily injury; Count II, Aggravated Assault, Serious Bodily Injury Caused and Serious Bodily Injury Attempted; Count III, Terroristic Threats; Count IV, Terroristic Threats; and Count V, Simple Assault.

Defendant appeared before the Court for sentencing on August 16, 2018. Defendant was sentenced to a period of not less than eleven and half (11 ½) years nor more than twenty-three (23) years for Count I. Due to merger of the offenses, no additional penalty was imposed for Count II. Defendant was sentenced to a period of incarceration for Count III of one (1) year less a day to no more than two (2) years less a day. The sentence for Count III was ordered to run concurrent to that in Count I. Defendant was sentenced in Count IV for an additional period of one (1) year less a day to no more than two (2) years less a day. This sentence runs consecutive to that imposed in Count I. The Court found that Count V merged with



Count II and no further sentence was imposed. Defendant was sentenced to a total aggregate sentence of not less than twelve and a half (12 ½) years less one day nor more than twenty-five (25) years less one day. He was also ordered to pay various costs and undergo a drug and alcohol evaluation. Defendant was entitled to a time credit commencing May 1, 2017.

On August 23, 2018, Defendant filed a Post-Sentence Motion in this case. By Order dated August 28, 2018, this Court denied Defendant's Post-Sentence Motion request. On September 25, 2018, Defendant appealed this matter to the Superior Court of Pennsylvania. Defense counsel later requested, and we granted, a continuance to file their concise statement of errors pursuant to Pa. R.A.P. 1925(b). Defendant's Concise Statement was filed on October 29, 2018. We now submit this statement in response to Defendant's allegations of error as required by Pa. R.A.P. 1925(a).

## Background

The facts of this case were testified to during trial. The series of events which culminated in Defendant's conviction began on April 25, 2017. (N.T., 6/19/18, p. 194.) On that day, Defendant met Ms. Brittany Seitz at the home of a mutual acquaintance, Mr. Raymond Ianuale. (N.T., 6/19/18, p. 195.) Defendant had recently been paid in cash for construction work he had performed and he was going to be looking for a new apartment. (N.T., 6/19/18, pp. 195-197.) According to Defendant's testimony at trial, he and Ms. Seitz ended up spending the night at Mr. Ianuale's home due to rain. (N.T., 6/19/18, p. 197.) At some point during the night, Defendant and Ms. Seitz agreed to go to Ms. Seitz's grandmother's home in the morning. (N.T., 6/19/18, p. 197.) Before leaving, Defendant "hit a pipe in the driveway" which he initially

2

believed was marijuana, but later realized it contained some other substance. (N.T., 6/19/18, p. 207.) The two left Mr. Ianuale's home at approximately 10:00 a.m. on April 26, 2018. (N.T., 6/19/18, p. 198.) Ms. Seitz then drove herself and Defendant in her car to a home where Ms. Seitz got into an argument with an older woman, possibly her mother. (N.T., 6/19/18, pp. 198-199.) After this exchange, Defendant and Ms. Seitz began driving toward the "Lehman Lake" area near Fernwood while Ms. Seitz made a number of phone calls. (N.T., 6/19/18, pp. 198-199.)[1] Defendant recalled that Ms. Seitz was upset and angry with her doctor due to some issue with medication and their trip to "Lehman Lake" involved seeking prescription medication from a friend of Ms. Seitz. (N.T., 6/19/18, pp. 205-206.) Defendant and Ms. Seitz continued to drive around together all day until well after 10:00 p.m. on April 26th. Defendant admitted that he and Ms. Seitz used drugs together during the day. Defendant stated, "[w]e parked at a Park and Ride at one point. [Ms. Seitz] put some powdery substance down, and I drank it, ate it, put it in my drink." (N.T., 6/19/18, p. 207.) Upon cross-examination, Defendant clarified that Ms. Seitz told him that the powdery substance was methamphetamine and he knew this when he consumed it. (N.T., 6/19/18, p. 227.)

On their way back to Mr. Ianuale's home late in the evening of April 26th or early in the morning of April 27th, Defendant alleged that Ms. Seitz pulled her vehicle over on Alpha Road not far from Mr. Ianuale's home. (N.T., 6/19/18, p. 208.) Defendant claimed they began to clean out the trunk of Ms. Seitz's car on the side of the road. (N.T., 6/19/18, p. 209.) According to Defendant, Ms. Seitz eventually walked into the woods by the side of the road and he fell asleep in the front passenger seat of the vehicle. (N.T., 6/19/18, p. 210.) Defendant's version of

---

[1] The Defendant gave this description of where he and Ms. Seitz were going. "Lehman Lake" does not appear to be a location in Monroe County. However, Fernwood, known in Monroe County as Fernwood Resort, is located near the Monroe County border with Lehman Township, Pike County, PA.

3

the events was that when he woke up in the vehicle, Ms. Seitz was on top of him waiving a knife around. The Defendant testified that Ms. Seitz put the knife down, but then proceeded to hit him with the rear view mirror of the car, before putting it down as well. The Defendant stated he got out of the car at that point and the Defendant followed him and started to stab him, leading to an altercation that spilled over onto the side of the road and down an embankment. (N.T., 6/19/18, pp. 210-216.)

Near where this altercation was happening, Mr. Hericson Torres was asleep at his home at 325 Five Springs Road in Snydersville, PA. (N.T., 6/19/18, p. 37.) Mr. Torres' brother-in-law, Mr. Brandon Caron, was also staying at the Torres home. (N.T., 6/19/18, p. 37.) Mr. Torres was awakened by his wife who claimed a female was screaming outside. (N.T., 6/19/18, p. 38.) Walking outside, Mr. Torres heard a female voice screaming, "Help. Help." (N.T., 6/19/18, p. 38.) Mr. Torres went in his vehicle to investigate the female voice, taking with him a flashlight, tee-ball baseball bat and a knife. (N.T., 6/19/18, pp. 39-41.) Mr. Torres noted the time was about 3:30 a.m. (N.T. 6/19/18, p. 42.) Mr. Caron had already left the home in his own vehicle to investigate after hearing the female voice yell, "[h]elp. He's killing me," and was the first person to arrive at the scene. (N.T., 6/19/18, p.70.) Upon arriving, Mr. Caron found the Defendant on top of Ms. Seitz and then dragging her into the woods. (N.T., 6/19/18, p. 72.) Mr. Caron saw the Defendant biting Ms. Seitz with his fingers in her eyes. (N.T., 6/19/18, p. 74.) Ms. Seitz was lifeless and Mr. Caron believed she was "pretty much dead." (N.T., 6/19/18, p. 74.)

Mr. Caron said that after yelling at the Defendant to stop and to get off Ms. Seitz, Defendant turned to him and said something similar to, "[g]et out of here. I stabbed her in the throat…I slit her throat…get out of here or I'll kill you too." (N.T., 6/19/18, p. 75.) When Mr.

4

Torres arrived at the scene, his brother-in-law pointed to the Defendant and said, "He's eating her . . . [h]e's eating her over there." (N.T., 6/19/18, p. 45:5.) Mr. Torres testified that due to the darkness he thought the Defendant may have actually been a bear. (N.T., 6/19/18, p. 45.) Mr. Torres also believed Ms. Seitz was dead. (N.T., 6/19/18, p. 46.) The two men attempted to hit, push, and kick the Defendant, but were unable to stop his attack on Ms. Seitz. (N.T., 6/19/18, p. 76.) Mr. Torres even struck the Defendant with the baseball bat with little effect. (N.T. 6/19/18, p. 51.) The Defendant replied to their efforts with, "[g]et out of here. I'll kill you." (N.T., 6/19/18, p. 77.) Mr. Torres testified that the Defendant told the two men to "[m]ind [their] own business. This is between me and her. (N.T., 6/18/19, p. 53.)

At approximately 4:00 a.m., Troopers Anthony Paciotti and Ian McMillan were called to the scene. (N.T., 6/19/18, p. 86.) The Defendant was still attacking Ms. Seitz while "she was on the ground lifeless." (N.T., 6/19/18, p. 89.) Trooper Paciotti saw the Defendant on all fours on top of Ms. Seitz, with his face in contact with her face. (N.T., 6/19/18, p. 90.) The trooper commanded the Defendant to stop and get off of Ms. Seitz, but he would not do so. Trooper Paciotti was then forced to kick the Defendant off of Ms. Seitz. (N.T., 6/19/18, p.91.) The Defendant was very incoherent and virtually naked. All of his clothes, except his underwear, had been removed and were lying in a pile at the bottom of the embankment. (N.T., 6/19/18, p. 96.) No knife was found down the embankment. (N.T., 6/19/18, pp. 97 and 159-160.) A knife in the closed position was found in Ms. Seitz's vehicle, but it is unknown whether or not it was used to inflict any injuries to the Defendant. (N.T., 6/19/18, pp. 163-164, 174-176.)

Once taken from the scene, it was observed that Ms. Seitz's nose had been partially amputated. (N.T., 6/19/18, p. 128.) She had also sustained multiple bruises and bite

marks. (N.T., 6/19/18, p. 128.) Both of her eyes were swollen shut. (N.T., 6/19/18, p. 131.) Defendant was also taken to the hospital where he was treated for a collapsed lung, head trauma, broken bones and multiple stab wounds. (N.T., 6/19/18, p. 223.) Defendant's blood work from the hospital showed that he had 398 nanograms per milliliter of methamphetamine in his blood. (N.T., 6/19/18, p. 151.) It was testified at trial that the therapeutic range for methamphetamines is 10 to 50 nanograms per milliliter. (N.T., 6/18/19, p. 151.) The amount that was in the Defendant's blood is considered toxic. (N.T., 6/19/18, p. 152).

<h3 style="text-align:center">Defendant's Concise Statement</h3>

1. **Defendant's conviction of Attempted Homicide is against the weight of the evidence -**

Defendant first avers that the Court erred in failing to find that the verdict of the jury as to the charge of Attempted Homicide was against the weight of the evidence presented by the Commonwealth at trial. For the requirements of proving Attempted Criminal Homicide, we cite this Court's March 23, 2018 Opinion on Defendant's Motion for *Habeas Corpus* Relief as follows:

> "A person commits a criminal attempt when 'with the intent to commit a specific crime he does any act which constitutes a substantial step toward the commission of that crime.' 18 Pa. C.S.A. §901(a). The substantive or specific crime at hand is criminal homicide. A person commits criminal homicide if 'he intentionally, knowingly, recklessly or negligently causes the death of another human being.' 18 Pa. C.S.A. §2501(a). There are three classification of criminal homicide: murder, voluntary manslaughter, and involuntary manslaughter. 18 Pa. C.S.A. §2501(b). 'The differences between the classifications [of criminal homicide] are largely a function of the state of mind of the

6

perpetrator.' Commonwealth v. Polimeni, 378 A/2d 1189, 1195 (Pa. 1977). Additionally, there are three classifications of murder: first degree, second degree, and third degree. 18 Pa. C.S.A. §2502.

The elements of First Degree Murder are as follows: '(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; (3) the defendant acted with malice and a specific intent to kill.' Commonwealth v. Thomas, 54 A.3d 332, 335 (Pa. 2012) (citing 18 Pa. C.S.A. §2502(a). An intentional killing is defined as a '[k]illing by means of poison, or by lying in wait, or by any other kind of *willful, deliberate and premeditated killing.* ' 18 Pa. C.S.A. §2502(d)(emphasis added). 'Malice is defined as: A wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty...Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.' Commonwealth v. Dunphy, 20 A.3d 1215, 1219 (Pa. Super. Ct. 2011) (quotations omitted). Establishing specific intent requires an investigation into the actor's state of mind. Commonwealth v. Shank, 883 A.2d 658, 664 (Pa. Super. Ct. 2005). In so doing, one can infer that 'an actor intends the natural and probable consequences of his acts. 'An offshoot of this principal is that a *specific intent to kill may be inferred from the use of deadly force upon a vital part of the human body.* ' Id. As such, 'where one does not verbalize the reasons for his actions, we are forced to look at the act itself to glean the intentions of the actor. [Id.] Where the intention of the actor is obvious from the act itself, the finder of the fact is justified in assigning the intention that is suggested by the conduct.' Id. Even where the actor has not stated his intent to kill, 'if a deadly force is knowingly applied by the defendant to another, the specific

7

intent to kill is as evident as if the defendant' had done so 'at the time the force was applied.' Id. Deadly force is a 'violent action known to create a substantial risk of causing death or serious bodily injury. Black's Law Dictionary (10th ed. 2014). 'As to what actions constitute deadly force, the analysis is not based merely on 'whether the defendant used a weapon, but rather, may be gauged by other factors including the seriousness and types of injury inflicted.' Id."

Defendant argues that the verdict was against the weight of the evidence or that the evidence was insufficient to support his conviction. The standard for reviewing the sufficiency of evidence is well established:

> "The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.

8

> Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence."

Com. v. Johnson, 2003 PA Super 354, 833 A.2d 260, 262–63 (2003) *quoting* Commonwealth v. Lambert, 795 A.2d 1010, 1014-1015 (Pa. Super. 2002).

Upon careful review of the testimony and exhibits offered at trial, we find that the jury's guilty verdict for the charge of Attempted Criminal Homicide was not against the weight of the evidence. Defendant admitted during trial that the incident happened. Additionally, Defendant did not downplay the seriousness of the altercation, stating that he "was doing whatever I could to stop [Ms. Seitz] from stabbing" him. (N.T., 6/19/18, p. 232.) However, all of the other witnesses testified that they saw only the Defendant as the aggressor, that the Defendant continued the assault for a long period of time while the victim lay lifeless, and no knife was found near the Defendant and victim. Defendant testified that he "was just continuing to protect [himself] and trying to fight for [his] life." (N.T., 6/19/18, p. 232.) Contrary to Defendant's explanation that he was simply trying to protect himself, there was testimony that Defendant verbally expressed his intention to kill Ms. Seitz. Mr. Torres testified that while trying to aid Ms. Seitz, Defendant said "[he]slit [Ms. Seitz's] throat, he killed her, he's going to kill me, mind my business." (N.T., 6/19/18, p. 46.) Mr. Caron reiterated these statements, testifying that the Defendant yelled at him "[g]et out of here. I stabbed her in the throat" or "I slit her throat…get out of here or I'll kill you too." (N.T., 6/19/18, p. 75.) Trooper MacMillan testified that by the time he and Trooper Paciotti were able to subdue the Defendant the only things he was able to communicate were various profanities and the word "kill" multiple times. (N.T., 6/19/18, p. 112.) The Defendant didn't tell any of the witnesses at the scene that Ms. Seitz

9

attacked him or tried to harm him. Based upon the testimony of these three witnesses, we find that it was not against the weight of the evidence for the jury to find the Defendant had the required intent to commit homicide.

The nature of the injuries suffered by Ms. Seitz leads to a possible finding that the Defendant took an affirmative step towards killing her. The Superior Court has held that a lay person can determine without expert testimony that severe injuries to a victim's head, stomach, and neck constitute damage to vital areas of the body necessary for life. Com. v. Robertson, 2005 PA Super 152, 874 A.2d 1200, 1207 (2005). Evidence of manual strangulation alone is sufficient to prove specific intent to commit murder. Com. v. Hawkins, 549 Pa. 352, 369, 701 A.2d 492, 500 (1997). Here, Ms. Seitz suffered serious injuries and witnesses testified that the Defendant was trying to choke her, while also biting her, hitting her, and gouging her eyes with his fingers.

The photographic exhibits submitted by the Commonwealth show significant damage to the victim's face and upper torso. (See Commonwealth Exhibits 4-7.) Both of Ms. Seitz's eyes are visibly swollen shut. (Commonwealth Exhibit 7.) On her right cheekbone, there appears to be a bite mark with a laceration of the skin, presumably caused by Defendant's teeth. (Commonwealth Exhibit 6.) There are other bruises consistent with bite marks on her chest and shoulder. (Commonwealth Exhibit 7.) The photographs show various other bruising and lacerations, the cause of which is not immediately identifiable without further evidence. (Commonwealth Exhibit 4.) However, Ms. Seitz's most striking injury was the trauma which occurred to her nose. The Commonwealth's photographs show that the tip of Ms. Seitz's nose was completely removed from her face. (Commonwealth Exhibit 6.) Both of her nostrils were

10

completely exposed. (Commonwealth Exhibit 4.) She had to have surgery and a follow-up procedure as a result. The photographs alone show significant damage was done to the victim's face and upper torso.

The witnesses who testified at trial reiterated the seriousness of the injuries suffered by Ms. Seitz. Upon arriving at the scene, Mr. Torres and Mr. Caron believed Ms. Seitz was already dead based upon the amount of blood present, the injuries to her face, and the fact that she was either unconscious or unmoving. Trooper MacMillan characterized the victim's injuries as "significant." (N.T., 6/19/18, p. 101.) The trooper had a difficult time describing the attack he had witnessed, stating, "[i]t was just…it's hard to really put words to it. It was just extremely aggressive. And just the method he was attacking her, you could tell he wasn't with it. He may have been psychotic or delusional…certainly not someone I would trust to put my back to after we just went through all that." (N.T., 6/19/18, p. 113.) Mr. Caron testified that he remembered Defendant "dragging, biting, throwing his hands. He had his fingers in her eyes. I remember the biting specifically." (N.T., 6/19/18, p. 74.) The Defendant also admitted to gouging the victim's eyes. (N.T., 6/19/18, p. 232.) Mr. Torres' testimony recollected that Defendant had his hands around Ms. Seitz's throat trying to strangle her. (N.T., 6/19/18, p. 51.) The Defendant also did not deny that he had bit a portion of Ms. Seitz's nose off when stating that he could not remember what he did with the appendage. (N.T., 6/19/18, p. 235.) All of this testimony, taken in consideration with the photographic evidence of Ms. Seitz's injuries, leads us to find Defendant attempted to injure a vital portion of Ms. Seitz's body with deadly force.

We next turn to the length of time in which this incident occurred. By all accounts, this was not a situation where the Defendant attacked Ms. Seitz and then fled, but

11

rather one in which he continually assaulted her, again and again, even after help had arrived. Mr. Torres estimated that he and Mr. Caron arrived at the scene at approximately 3:30 a.m. (N.T., 6/19/18, p. 52.) The police did not arrive until 4:00 a.m. (N.T., 6/19/18, p. 52.) During that half hour period, Defendant was continually being forced off Ms. Seitz, only to get back on top of her in order to cause more injuries, even as he was being struck with a baseball bat. (N.T., 6/19/18, p. 52.) Ms. Seitz was not moving at this point in the attack. The considerable amount of time in which this attack occurred, coupled with Defendant's persistence in trying to inflict further injury upon Ms. Seitz, shows a clear intent to cause her deadly harm. Defendant severely beat Ms. Seitz, attempted to strangle her, gouged at her eyes with his fingers, and amputated part of her nose with his own teeth. When confronted with two Good Samaritans, Defendant turned his ire on them and threatened their lives as well. Only after the troopers arrived, and were able to kick the Defendant off of Ms. Seitz, with Trooper MacMillan's taser drawn, did the Defendant stop. (N.T., 6/19/18, pp. 108-110.) Based upon all of this, we believe that the jury appropriately found Defendant acted with the necessary intent and took a substantial step toward killing Ms. Seitz.

As a final matter, we must examine Defendant's self-defense argument to determine if the jury's verdict was against the weight of evidence. At trial, Defendant argued that any physical force against Ms. Seitz was justified because she was the initial aggressor and he acted in self-defense. Defendant cited the multiple serious injuries he suffered as a result of the event in the morning of April 27, 2017, as evidence that he had been protecting himself when attacking Ms. Seitz. (N.T., 6/19/18, p. 223.)

> "It has long been the law of Pennsylvania that in order to establish
> the defense of self-defense, three essential elements must be

12

> proved by the defendant by a preponderance of the evidence: (1) The slayer must be free from fault in provoking or continuing the difficulty which resulted in the [harm]…(2) The slayer must have reasonably believed that he was *in imminent danger* of death, great bodily harm, or some felony, and that there was a necessity to kill in order to save himself therefrom…(3) The slayer *must not have violated any duty to retreat* or avoid danger."

Com. v. Light, 458 Pa. 328, 326 A.2d 288, 291 (1974) (internal quotations removed) (emphasis added). Additionally, 18 Pa. C.S.A. §505(b)(2)(ii) says "[t]he use of deadly force is not justifiable…unless the actor believes such force is necessary…nor is it justifiable if…the actor knows that he can avoid the necessity of using such force with complete safety by retreating."

Here, even if Defendant was free from fault in provoking the fight between himself and Ms. Seitz, he certainly did not retreat once it was safe to do so. This incident went on for more than half an hour after Mr. Torres and Mr. Caron appeared at the scene, during which Ms. Seitz was either unconscious or unmoving. Both Mr. Torres and Mr. Caron testified that Ms. Seitz appeared lifeless and the Defendant continued attacking her while they were on the scene to assist. The only knife found at the scene was in the vehicle, while the Defendant was assaulting the victim some distance away in the woods at the bottom of an embankment. Instead of retreating from the situation once Ms. Seitz was incapacitated, Defendant continued to maul her as the two men tried to physically remove him, going so far as to beat him with a baseball bat to try and stop his attack. In response, Defendant fought against the two men and threatened their lives. At no time did he ask the two men for help. (N.T., 6/19/18, p.77.) Defendant also did not retreat once uniformed Pennsylvania State Troopers arrived at the scene and let their presence be known. He had to be kicked off of Ms. Seitz and threatened with a taser before stopping. It is

13

clear from the testimony that even if Defendant's initial actions were justifiable, his continued assault on Ms. Seitz went far beyond the justification of self-defense.

Because the main source of Defendant's self-defense claim was his own testimony, we also must consider the reliability of that testimony. Although the Defendant gave specific testimony on the first day of trial regarding the events leading up to the crime, on the second day he admitted that he has had difficulty remembering the entire incident. (N. T., 6/20/18, pp. 65-66.) Specifically, the Defendant testified that originally "[t]he event was quite foggy actually. I could remember certain things." (N. T., 6/20/18, p. 65.) However, the Defendant admitted that he is still trying to remember the events of the day because his "memory comes back slowly when [he] see things." (N.T., 6/20/18, p. 66.) Perhaps the most concerning aspect of Defendant's memory came from the Commonwealth's line of questions involving the amputation of Ms. Seitz's nose.

> "Q: Sir, you know, I forgot to ask you…what did you do with it, with her nose? What did you do with it?
> A: (No verbal response.)
> Q: When you bit her nose off, what did you do with it?
> A: I don't have an answer. I'm sorry.
> Q: You don't recall if you swallowed it, spit it out? That doesn't stand out in your mind?
> A: No. At a certain point, I started to go incoherent; in and out."

(N.T., 6/19/18, p. 235.) It is reasonable that a jury might call into question Defendant's memory or perception of the occurrence when he was able to recall seemingly minute details of the events leading up to the attack, but not such an important part of the attack itself. "[T]he credibility of [a] witness' testimony and weight assessed hereto is a question for the trier of fact unless so

14

inconsistent as to allow no finding beyond a reasonable doubt" <u>Com. v. Robertson</u>, 2005 PA Super 152, 874 A.2d 1200, 1206 (2005). We find that based upon the testimony, it was not against the weight of the evidence for the jury to disregard Defendant's self-defense claim.

2. **The Court erred in allowing the Affiant to testify regarding Ms. Seitz's statements over a hearsay objection** –

Defendant next argues that the Court erred in allowing the Affiant, Trooper Christopher Tomlinson[2], to testify as to statements made by Ms. Seitz over a hearsay objection. We take the objection to be as to Trooper Paciotti's testimony and Trooper Tomlinson's testimony as made at time of trial. Trooper Paciotti was questioned by counsel for the Commonwealth about statements made by Ms. Seitz at the hospital. (N.T., 6/19/18, pp. 101-103.) Trooper Tomlinson also spoke to Ms. Seitz after the incident. (N.T., 6/19/18, pp. 187-188.) Defendant argues that statements made during the interviews were improperly testified to by Trooper Paciotti and Trooper Tomlinson. "Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error of judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence of record." <u>Com. v. Cooper</u>, 596 Pa. 119, 941 A.2d 655, 667 (2007) (internal citations and quotations removed).

---

[2] Although three Pennsylvania State Troopers testified in this trial, Trooper Tomlinson is listed as the Affiant on the Criminal Complaint. The two other Troopers testified to statements made by Ms. Seitz at the time of the incident. It does not appear from Defendant's Concise Statement of Errors which testimony he wishes the Superior Court to review. There does not appear to be any objection by the Defendant to testimony of Trooper MacMillon. Defendant's objection at trial appears to be as to Trooper Paciotti's testimony made at page 102. (N.T., 6/19/18, p. 102.) The Defendant also objected to Trooper Tomlinson's testimony at pp. 187-188. (N.T., 6/19/18, pp. 187-188.) We can only consider matters objected to at time of trial, and any matters not objected to are waived.

During Trooper Paciotti's testimony, Defendant's counsel objected to hearsay about the Trooper's conversation with Ms. Seitz as asked on re-direct. (N.T., 6/19/18, p. 102.) This was after Defendant's counsel had asked the trooper about other parts of his conversation with Ms. Sietz. (*See* N.T., 6/19/18, pp. 99-100.) The Commonwealth sought to allow the rest of Ms. Seitz's statement for the full context about what Defendant's counsel had just asked on cross-examination. (N.T., 6/19/18, p. 102.)[3] The door was opened by Defendant's counsel first about the incident in question. Therefore, the objection was overruled.

During re-direct examination of Trooper Tomlinson, the Commonwealth also began to ask him questions about what Ms. Seitz had told him during an interview. Trooper Tomlinson testified "Ms. Seitz told me that she and the defendant, Mr. Gardner, she had picked him up. He was driving because she wasn't feeling well. They stopped on the road." (N.T., 6/19/18, pp. 197-188.) At that point, defense counsel objected, stating the testimony was hearsay. The Court overruled the objection and Trooper Tomlinson continued with the following testimony:

> "So Ms. Seitz told me that she went to pick up Mr.
> Gardner. He drove because she wasn't feeling well. While driving
> back to the road, Alpha Road, he started to yell, scream, call her
> different names of different females, different people.
>
> She said he then pulled over to the side of the road. During
> that time, he started yelling and screaming at her. He then attacked
> her. He started trying to choke her, grabbed her head, tried to
> shove it down to the floor.

---

[3] The victim, Ms. Sietz, did not testify at time of trial; nor did Mr. Iaunale, who was referenced as being at the scene of the incident at some point.

16

She was then able to get out of the vehicle and crawl out of the vehicle. At which time, she said Mr. Gardner followed her and drug her out the rest of way of the vehicle and then was on top of her, attacking her, and dragged her down to the ditch."

(N.T., 6/19/18, pp.188-189.)

Upon careful review of the record, we find no error in allowing this testimony. During cross-examination of Trooper Tomlinson, counsel for the Defendant actually brought up Ms. Seitz's statements first. After a series of questions by Defendant's counsel about whether or not Ms. Seitz admitted to having a knife and using it on the night of the incident, the Commonwealth objected to the line of questioning. (N.T., 6/19/18, p. 173.) At side-bar, the Commonwealth objected to the statements as hearsay. (N.T., 6/19/18, p. 173.) Defendant responded with "[y]our honor, this is regarding his interview of the victim, prior inconsistent statement. She's given multiple statements in this case, so I believe it is admissible." (N.T., 6/19/18, pp. 173-174.) The Court agreed and overruled the objection. Essentially, Defendant opened the door to the statements Ms. Seitz made to Trooper Tomlinson and now seeks the Court to find error in allowing the Commonwealth to continue questioning the witness about the same statements. This is the exact argument the Commonwealth made when defense counsel objected during re-direct examination; "[Defense counsel] asked about statements that Ms. Seitz made regarding the stabbing in this incident. This is just flushing out for the jury the whole of the statement that was made." (N.T., 6/19/18, p. 188.) The Defendant offered the testimony for the purpose of prior inconsistent statements; however, the testimony did not actually turn out that way. (N.T., 6/19/18, pp. 173-175). The Commonwealth sought to admit statements of Ms. Seitz as to the entire event, showing consistent statements. We agree that the testimony was proper in

17

light of the statements initially being introduced by the defense. It would be fundamentally unfair for one side to be able to question a witness about inconsistent statements made by a victim, while denying the opposing side opportunity to show the statements were not inconsistent.

3. **The Court erred in sustaining the Commonwealth's objection to the admittance of a statement on Ms. Seitz's personal Facebook page when she allegedly wrote "if she killed someone it would be her psychiatrist's fault" when Defendant had argued self-defense at trial –**

Defendant's final assertion of error is that the Court erred in sustaining the Commonwealth's objection to the admittance of a post allegedly made on Ms. Seitz's Facebook page. "Generally, two requirements must be satisfied for a document to be admissible: it must be authenticated and it must be relevant. In other words, a proponent must show that the document is what it purports to be and that it relates to an issue or issues in the truth determining process." Stotz v. Shields, 696 A.2d 806, 808 (Pa. Super. Ct. 1997) *quoting* Commonwealth v. Brooks, 352 Pa.Super. 394, 397, 508 A.2d 316, 318 (1986). "A document may be authenticated by direct evidence such as an admission. A document also may be authenticated via circumstantial evidence relating to a myriad of considerations including its appearance, contents, and substance. Acknowledged writings, public records, and under Federal Rule of Evidence 902, documents purporting to be issued by public authority, are self-authenticating." Id at 809 (internal citations omitted.).

During direct examination of Joseph Alercia, an investigator who was allegedly familiar with Ms. Seitz, Defendant sought to introduce a Facebook post allegedly made by Ms. Seitz two days before the incident in which she stated that if she killed someone, it would be her

18

psychiatrist's fault. (N.T., 6/20/18, p. 46.) Defendant argued this post was relevant to establishing Ms. Seitz 's propensity for violence. Outside the presence of the jury, Mr. Alercia was examined as to his familiarity with Ms. Seitz. Mr. Alercia stated that he was aware that Ms. Seitz suffered from post-traumatic stress disorder and anxiety, and that she was on medication for these diagnoses. (N.T., 6/20/18, p. 51.) Mr. Alercia also indicated that he had spoken to Ms. Seitz on the telephone and she had admitted to having a Facebook page. (N.T., 6/20/18, p. 52.) Defendant argued that this information was sufficient to authenticate the post. During the Commonwealth's questioning, Mr. Alercia conceded that he did not know that there were multiple pages of accounts with the name of Brittany Seitz on Facebook. (N.T., 6/20/19, p. 54.) Mr. Alercia admitted that he did not have an IP address, user name, or password for Ms. Seitz's Facebook. (N.T., 6/20/18, p. 57.) Also, Mr. Alercia stated that he had never met Ms. Seitz in person and that she never admitted to writing the subject post. (N.T., 6/20/18, p. 57.) It was also unclear how Mr. Alercia knew of Ms. Seitz's mental health condition, or upon what information he may have relied.

Upon review, we find no error in denying the admittance of the alleged Facebook post at trial. The Superior Court in Commonwealth v. Mangel found no error in denying evidence of a social media post in similar circumstances. In Mangel, the Commonwealth attempted to introduce a social media post when the defendant did not claim the account or post as his own, the Commonwealth was unable to produce testimony from someone with personal knowledge of the post, and the Commonwealth lacked a username or password to confirm the account's authenticity. Commonwealth v. Mangel, 2018 PA Super 57, 181 A.3d 1154, 1163 (2018). Evidence that linked the Facebook page to the defendant's name, hometown, school

district and certain pictures was found to be insufficient. Id. The court ultimately ruled that a party attempting to introduce social media posts must produce evidence of distinct characteristics of the posts and messages which would indicate a specific person was the author. Id at 1164. Here, the Defendant was unable to produce the necessary distinct characteristics to authenticate the Facebook post. We find that a general reference to a psychiatrist when the victim is allegedly known to suffer from mental health disorders is insufficient to overcome the burden described in Mangel without further supporting evidence. There was no admission by Ms. Seitz that she posted the statement or that this Facebook account was her account. The Defendant could not produce any other information that the account belonged to Ms. Seitz. Furthermore, Mr. Alercia had no first-hand knowledge of Ms. Seitz's mental health upon which to form conclusions.

We also believe the Facebook post in question was not relevant. Defendant argued at trial that it was relevant to Ms. Seitz's propensity for violence. We disagree. The post is more of a statement than threat, Ms. Seitz allegedly said that *if* she were to kill someone it would be her psychiatrist's fault, not that she felt like killing someone or planned to do so. There was also no evidence at trial that Ms. Seitz was a particularly violent person, other than what limited evidence Mr. Alercia could give, having never actually met her. Additionally, the post itself does not directly threaten Defendant. It could not possibly have directly addressed Defendant because Ms. Seitz had not yet met Defendant at the time she allegedly wrote it. Therefore, we find that even if the post had been properly authenticated, it was not relevant to proving any propensity for violence, particularly toward Defendant.

Defendant argues the Facebook post was essential to his self-defense claim. However, we do not agree with that assertion either. There are two grounds for a successful

20

claim of self-defense. First, a defendant may prove the victim's bad character and propensity for violence to support the allegation that the victim was the initial aggressor. <u>Com. v. Mouzon</u>, 617 Pa. 527, 53 A.3d 738, 741 (2012). Alternatively, a defendant may introduce his own knowledge of the victim's violent character to show he acted out in response to reasonable fear. <u>Id</u>. For reasons we have previously stated, we do not believe the Facebook post allegedly authored by Ms. Seitz accomplishes either of these requirements. First, we do not believe that this post, even if properly authenticated, shows a propensity towards violence such that a jury would find that she sought out Defendant to be the aggressor in their altercation. Second, the Facebook post could not possibly have caused Defendant to respond in reasonable fear because there was no evidence that he had ever seen the post or had access to Ms. Seitz's Facebook page. The short time period between Defendant meeting Ms. Seitz and this event happening was so short, it is unlikely that Defendant could have been aware of anything Ms. Seitz did or did not post on social media. Therefore, it has no relevance to his self-defense claim.

Accordingly, we find no merit in Defendant's alleged errors.

BY THE COURT:

_____
DAVID J. WILLIAMSON, J.

DATED: 11|28|18

cc: District Attorney (MB)
Public Defender (CB)
DJW2018-110 Cmwlth v Leo Gardner- 1172 CR 2017.docx

Clerk of Courts
NOV 28 '18 PM 12:44

21