J-S02024-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LISA SMITH | : | |
| | : | |
| Appellant | : | No. 3302 EDA 2019 |

Appeal from the Order Entered July 31, 2019,
in the Court of Common Pleas of Montgomery County,
Criminal Division at No(s): CP-46-CR-0001628-2018.

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:　　　　　**FILED: JUNE 14, 2021**

Lisa Smith appeals from the judgment of sentence of life without parole, followed by an aggregate sentence of 15 to 30 years of incarceration. A jury convicted Smith of murder of the first degree for killing her four-year-old son, Tehjir Smith; conspiring to murder him; endangering Tehjir's welfare; and conspiring to endanger his welfare.[1] We affirm.

Smith and her boyfriend/co-defendant, Keiff King, began living together in early 2017. King was not Tehjir's father.[2]

---

[1] **See** 18 Pa.C.S.A. § 2502(a)), 4301(a)(1), 903(a)(1).

[2] King is not a party to this appeal. The jury convicted King of the same offenses as Smith, and the trial court imposed an identical sentence upon him. **See Commonwealth v. King**, 3199 EDA 2019, 2020 WL 4783304 (Pa. Super. 2020) (unpublished decision) (affirming King's judgment of sentence over his challenges to the sufficiency of the evidence and the discretionary aspects of sentencing).

Between 2017 and Tehjir's death (less than a year later), the child "endured months of physical and emotional abuse at the hands of his mother [and] King." Trial Court Opinion, 2/10/20, at 3. This physical abuse included severe beatings with belts and shoes, slaps to the head, being required to hold a plank position for hours on end, and a scalding hot shower that sent the boy into shock.

The trauma rendered Tehjir too weak to stand or remain on a couch on January 22, 2018. Rather than call 911 immediately, Smith and King feared law enforcement would be suspicious of their actions, so they attempted to carrying the boy to a hospital. During the walk Tehjir lost consciousness, and Smith decided to call 911. King departed before the authorities arrived.

An ambulance responded first, and an EMT tried to revive Tehjir. Next, a police officer pulled up in marked patrol car, and the EMT informed only the officer that Tehjir was dead. The police began questioning Smith.

She lied about events and said Tehjir had an asthma attack. The police arrested Smith; transported her to the station for further questioning; and, after two-hours of interviewing her, provided Smith with ***Miranda v. Arizona***, 384 U.S. 436 (1966), warnings. After signing a form waiving those constitutional rights, Smith continued speaking with police for three hours, recanted her false tale, and dictated a three-page confession to abusing her son to death with King.

Smith moved to suppress all of her statements to the police. The trial court suppressed the statements Smith made prior to receiving her ***Miranda*** warnings but refused to suppress her subsequent confession.

The case proceeded to a joint jury trial of Smith and King. Over Smith's objection, the trial court admitted King's redacted confession to the police as evidence against him. In doing so, the court instructed the jury that it could only consider King's confession to decide King's guilt, because King refused to testify, and Smith could not cross-examine him regarding his confession.

The jury convicted Smith, and the trial court sentenced her as described above. Post-trial, Smith moved for judgment of acquittal on the murder and conspiracy-to-commit-murder charges, because she believed there was not enough evidence to prove her intent to kill Tehjir. The trial court denied relief, and this timely appeal followed.

Smith raises the following issues:

1. Whether the trial court erred in denying the motion to suppress [Smith's] January 22, 2018, statement . . .

2. Whether the trial court erred in admitting the statement of [Smith's] co-defendant, Mr. Keiff King, in violation of ***Bruton v. U.S.***, 391 U.S. 123 (1968) . . .

3. Whether the evidence presented at trial was sufficient to prove beyond a reasonable doubt that [Smith] had the requisite intent for the "intentional killing" element of the charge murder of the first degree or the charge criminal conspiracy to commit murder of the first degree.

4. Whether the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Appellant had the requisite

> "intent of promoting or facilitating" the commission of the underlying crime, in this case Murder of the First Degree.

Smith's Brief at 6-7 (unnecessary capitalization and citations omitted).

The learned Judge Risa Vetri Ferman of the Court of Common Pleas of Montgomery County authored a detailed, well-reasoned, 1925(a) Opinion, which correctly disposes of Smith's four claims of error. We therefore adopt it as our own.

The trial court explained that the police properly treated Smith while interrogating her and engaged in no coercive conduct. Thus, Smith's post-*Miranda* statements were voluntarily given and therefore admissible against her at trial. Also, the trial court did not abuse its discretion in admitting King's redacted confession in the joint jury trial, solely for the purpose of inculpating King. The trial court's explanation for this evidentiary ruling is rational and does not override the law. Finally, the trial court correctly held that the Commonwealth introduced evidence from which the jury could reasonably infer that Smith intended to kill Tehjir through her repeated acts of horrific abuse and her failing to seek aid when his health and life were obviously in peril. The same is true of the conspiracy-to-commit-murder conviction.

The parties shall attach the trial court's 2/10/20 Opinion to this decision in all future filings.

Judgment of sentence affirmed.

- 4 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/14/21

**IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA                          CR-1628-2018

VS                                                   3302 EDA 2019

LISA SMITH

**OPINION**

FERMAN, J.                                           February 10, 2020

**Factual and Procedural History**

Appellant, Lisa Smith, appeals from this court's judgment of sentence imposed on July 31, 2019, which became final when the court denied her post sentence motion on October 24, 2019. On June 20, 2019, a jury found Appellant guilty of one count of first degree murder,[1] one count of criminal conspiracy to commit first degree murder,[2] one count of endangering the welfare of a child, course of conduct, and one count of conspiracy to commit endangering the welfare of a child, course of conduct.[4] On July 31, 2019, this court sentenced Appellant to a mandatory term of life imprisonment without the possibility of parole[5] on the charge of first degree murder (count 1). On count 2, conspiracy to commit first degree murder, the court sentenced

---

[1] 18 Pa.C.S.A. § 2502(a).

[2] 18 Pa.C.S.A. § 903(a)(1).

[3] 18 Pa.C.S.A. § 4304(a)( I)

[4] 18 Pa.C.S.A. § 903(a)(1).

[5] 18 Pa.C.S.A. § 1102(a)( I).

1

Appellant to a term of imprisonment of not less than twenty (20) years nor more than forty (40) years to run concurrently with the sentence imposed on count 1. On count 12, endangering the welfare of a child, the court sentenced Appellant to a term of imprisonment of not less than ten (10) years nor more than twenty (20) years to run consecutively to the sentence imposed on counts 1 and 2. On count 13, conspiracy to commit endangering the welfare of a child, the court sentenced Appellant to a term of imprisonment of not less than five (5) years nor more than ten (10) years to run consecutive to the sentence imposed on count 12. The court imposed a total aggregate sentence of life imprisonment plus fifteen (15) to thirty (30) years. Appellant was also sentenced to pay restitution in the amount of $6,682.00, the amount to be paid joint and several with co-defendant Keiff King (King").

On August 6, 2019, Appellant filed a timely Post Sentence Motion, claiming that the verdict rendered was contrary to the weight of the evidence, and the sentence imposed was manifestly excessive, unreasonable, and an abuse of discretion. On August 15, 2019, the Commonwealth filed an Answer to Defendant's Post Sentence Motion. On October 24, 2019, the court denied Appellant's Post Sentence Motion. On November 18, 2019, Appellant filed a timely Notice of Appeal with the Superior Court of Pennsylvania. On November 20, 2019, this court ordered Appellant to file a Concise Statement of Matters Complained of on Appeal ("Concise Statement). On December 2, 2019, Appellant filed her timely Concise Statement. The undersigned now files her 1925(a) Opinion.

2

This case involved a 4 year old child, T.S., who endured months of physical and emotional abuse at the hands of his mother, Appellant, and her boyfriend, King. The abuse ultimately culminated in T.S.'s murder on January 22, 2018 after a day of repeated abuse, beatings and punishments at King's home. King's home is located at 1843 Lukens Avenue, in Willow Grove, Montgomery County, Pennsylvania. At the time this incident occurred, Appellant was six months pregnant with King's child. (N.T. 6/18/19 at 180).

By way of background, Appellant began dating King in early 2017. Beginning around this time, Appellant and T.S. stayed regularly at King's home in Willow Grove with King, King's two children, ages 3 and 4, King's grandmother, and King's 18 year-old cousin. (N.T. 6/18/19 at 180-181). In the summer of 2017, Smith became pregnant with King's child. This is when T.S.'s family, friends, and caregivers started seeing injuries on T.S., and suspected abuse. (N.T. 6/19/19 at 316, 449-453, 463-464, 479-480, 496, 503-504, 519-521, 546-547). As a result, different family members and caregivers cared for T.S. for periods of the time between September and December of 2017. (N.T. 6/19/19 at 453-455, 483, 529-530).

Zakiyyah Holly ("Holly"), the mother of T.S.'s half sister, testified at trial that in June through September of 2017, T.S. would often play at her house with her children. (N.T. 6/19/19 at 314-315, 325). She testified that around September of 2017, she observed injuries on T.S.'s back. (N.T. 6/19/19 at 316). On the day Holly first observed these injuries, Appellant dropped T.S. at Holly's house and asked her if she had any ointment for T.S.'s back. (N.T.

3

6/19/19 at 316). Holly observed T.S.'s back and described it as, "... it was like meat and like skin coming off. And I seen (sic) like an older bruise on his back and stuff like that. ... It looked like a rug burn. It looked he was being drug up the steps or wherever. It was like really big. It was healing, too. It was definitely healing. Then it was like an older bruise on the back that didn't have nothing to do with the scar on his back." (N.T. 6/19/19 at 316-317). Holly confronted Appellant when she observed these injuries, and Appellant told her that T.S.'s injury was the result of a rug burn because "he peed on the toilet." (N.T. 6/19/19 at 316-318). Holly also observed that T.S. had a healing black eye. (N.T. 6/19/19 at 318-319).

Brenda Pauline ("B. Pauline"), Appellant's sister also observed the "welts and bruises" on T.S.'s back, the rug burn on his back, and his healing black eye. (N.T. 6/19/19 at 479-482). B. Pauline testified that T.S. told her that his eye was injured because Appellant punched him. (N.T. 6/19/19 at 504).

Appellant's mother, August Pauline ("A. Pauline) corroborated Holly and B. Pauline's testimony and testified that during the summer of 2017 she also observed the injuries on T.S.'s back and eye. (N.T. 6/19/19 at 449-453). A. Pauline also testified that during that time T.S. complained that his side was hurting. (N.T. 6/19/19 at 449-450).

Anthony Cross ("Cross") is T.S.'s paternal grandfather, and he saw T.S. every few weeks at his home in Philadelphia when T.S. would stay overnight there for two to three days at a time. (N.T. 6/19/19 at 514-515, 517-518). Cross testified that beginning around July 2017, when T.S. would come to stay

4

with him, he complained of pain in his side around his rib area. (N.T. 6/19/19 at 515-517). On September 19, 2017, B. Pauline brought T.S. to Cross's house and showed Cross injuries on T.S.'s back. (N.T. 6/19/19 at 520-521). Cross described the injuries as, "carpet marks on his back, burn marks on his back." (N.T. 6/19/19 at 520). Cross also observed that T.S. had a black eye and he took a photograph of his black eye. (N.T. 6/19/19 at 518-519, Exhibit C-66). After observing the injuries, Cross reached out to Appellant via text message and a phone call on September 19, 2017, telling her that he suspected T.S. was being abused and he wanted T.S. to stay with him. (N.T. 6/19/19 at 519-524, Exhibits C-67 through C-72). Appellant went to Cross's house and told him that T.S.'s black eye was the result of him falling" ... or something like that." (N.T. 6/19/19 at 525-526). Appellant told Cross that she dragged T.S. across the rug and when he asked her why, she told him, "there is something wrong with me. I need help ..." (N.T. 6/19/19 at 526-527).

As a result of observing these injuries in September 2017, family members and caregivers decided that T.S. should no longer stay with Appellant and King. (N.T. 6/19/19 at 318-321, 335, 483-486, 504-505, 526-530). Appellant and T.S. stayed with Cross for approximately three days. After three days, Appellant went back to King's house, but T.S. stayed with Cross for an additional few days. (N.T. 6/19/19 at 529-532). After that, T.S. went to stay with Appellant's sister/his aunt, B. Pauline. T.S. stayed with B. Pauline from September 2017 until approximately December 25, 2017. (N.T. 6/19/19 at 318-321, 335, 483-486, 505, 530-531).

5

The events of the day leading up to T.S.'s murder on January 22, 2018 began at approximately 9:30 AM when T.S. spilled his cereal. (N.T. 6/19/19 at 416). Appellant and T.S. were at King's house in Willow Grove. When Appellant confronted T.S. about the spill, he wet his pants and started stuttering. (N.T. 6/19/19 at 416-417). As a result, T.S. was punished. Appellant and King forced him to stay in "the position" which was a plank position, or a push-up position, but not actually doing the push-up. (N.T. 6/18/19 at 217-218; N.T. 6/19/19 at417). He was left in "the position" for spans of time throughout that day. Appellant yelled at him and reprimanded him when he was unable to hold the plank position. (6/19/19 at 419-420). T.S. started stuttering again. (N.T. 6/19/19 at 418). Appellant explained that T.S. stutters when he is scared. (N.T. 6/19/19 at 418). When T.S. was "cheating" in "the position" by propping his legs up on the bed, King moved him with his leg so that T.S. was unable to use the bed for support. (N.T. 6/18/19 at 232). When T.S. told Appellant he was tired and wanted to get out of "the position," Appellant put him in a "new position" where he was forced to remain in a push up position, but this time with his feet propped up on a kitchen chair. (N.T. 6/19/19 at 419).

After being forced to remain in "the position" and being reprimanded for "cheating" in "the position," Appellant and King continued to physically abuse T.S. throughout the day by hitting him on his buttocks repeatedly with a flip flop. Appellant hit T.S. with the flip flop six or seven times. (N.T. 6/19/19 at 419-420). King hit T.S. on his buttocks with his bare hand two or three

6

times, and with the flip flop three or four times, admitting to spanking T.S. and giving him a "butt whooping." (N.T. 6/18/19 at 217-219, 221, 225, 231-233). Appellant stated that T.S. never made a sound during the beating. (N.T. 6/19/19 at 420). King stated that T.S. removed his pants in preparation for these beatings "because he knew it was butt whopping time." (N.T. 6/18/19 at 220). King also admitted that on January 22, 2018 he slapped T.S. in the head. (N.T. 6/18/19 at 232). King stated that he was the disciplinarian in the house and he would hit the children with his hand and strike them with a belt. (N.T. 6/18/19 at 235). He stated that he used a flip flop to hit T.S. because he would "no longer respond to being hit with a hand." (N.T. 6/18/19 at 235).

During the beating, T.S. urinated on himself, so King turned on the water for T.S. to take a shower. (N.T. 6/19/19 at 420; N.T. 6/18/19 at 233). T.S. yelled that it was too hot. (N.T. 6/18/19 at 220, 233-234). King turned the water on so hot that T.S. sustained burns. Appellant went to check on T.S. after he had been in the shower for approximately three (3) minutes. (N.T. 6/19/19 at 421). T.S. had a hard time getting out of the tub. (N.T. 6/19/19 at 421). He was unable to stand up. (N.T. 6/19/19 at 421-422). When Appellant went to dress T.S. he was unable to lift up his foot to put his sock on. (N.T. 6/19/19 at 421-422). Appellant stated that T.S. was lying on the bathroom floor with a stuck face; he couldn't hold his head up straight. (N.T. 6/19/19 at 421).

Appellant then took T.S. into the living room and placed him on the sofa. (N.T. 6/19/19 at 422). T.S. complained he was sleepy. (N.T. 6/19/19 at 422).

7

King also observed T.S. on the sofa "...laying there like he was going to sleep." (N.T. 6/18/19 at 222). King believed that he was just being "dramatic," and went in his bedroom watching television and having something to eat. (N.T. 6/18/19 at 222). Appellant was also in the bedroom. (N.T. 6/19/19 at 422). After approximately five minutes, Appellant went to check on T.S., and she observed that he had fallen off the sofa onto the floor. (N.T. 6/19/19 at 422). T.S. was unable to pick himself up to get back on the sofa. (N.T. 6/19/19 at 422). King also observed T.S. "...laying on the floor on his back. ...he was looking like he was going to pass out. He was like closing his eyes." (N.T. 6/18/19 at 222-223). Appellant stated, "his lips were moving weird. I could see that [T.S.] was going out. His eyes weren't looking at me. I waited to see if he would do it again. [T.S.'s] mouth began to move weird again .... [T.S.'s] eyes began to roll back into his head, and his mouth was open." (N.T. 6/19/19 at 422-423). Appellant stated that she knew something was wrong when he was on the floor moving his lips weird. (N.T. 6/19/19 at 428).

Neither Appellant nor King called an ambulance for immediate assistance. Instead, King called his Aunt Cheryl to see if she could come, but she was 20 minutes away. King stated that he did not want an ambulance coming to the house because "the last time I had to call an ambulance...they tried to...make it out like I was a criminal. I didn't want them to come to the house." (N.T. 6/18/19 at 223-224). Appellant called Holly asking her for an Uber or a Lyft ride. Holly replied that she did not have one, and asked what was wrong, to which Appellant did not reply and hung up. (N.T. 6/19/19 at

8

324). Still declining to call 9-1-1, nearly ten to fifteen minutes after observing T.S. "on the ground moving his lips", Appellant and King put a coat on T.S., and Appellant left the house holding T.S. and began to walk. (N.T. 6/19/19 at 428). Appellant finally called 9-1-1 from the corner of Coolidge and Columbia in Willow Grove. (N.T. 6/19/19 at 423, 425, 428; Exhibit C-20).

Paramedic Lars Holm responded to the call via ambulance. When he arrived at the intersection of Coolidge Avenue and Columbia Avenue in Willow Grove, he saw Appellant holding a limp child. Holm approached her, and she quickly handed T.S. to him and said, "just take him," and walked away. (N.T. 6/18/19 at 156) Lars Holm knew immediately when he took T.S. that he was dead. (N.T. 6/18/19 at 157, 159). Appellant never asked paramedics how her son was doing and she never got in the ambulance with him. (N.T. 6/18/19 at 170, N.T. 6/19/19 at 381). T.S. was transported to Abington Memorial Hospital.

Detectives and Officers from the Abington Township Police Department responded to the scene at Coolidge and Columbia Avenues. Officer Alex Levy, and Officer Dustin Wittmer, both of the Abington Township Police Department, arrived on the scene and spoke with Appellant. (N.T. 6/19/19 at 380, 392). Appellant told the Officers that she took the bus from Philadelphia to the Willow Grove Mall Park bus stop, and she was walked with T.S. through a parking lot and an opening in the fence to arrive at the location from where she called 9-1-1. (N.T. 6/19/19 at 380, 394-397). She went on to say that T.S. started having difficulty breathing, and his legs got wobbly, so she picked him

9

up to carry him. (N.T. 6/19/19 at 394). She attributed these issues to his asthma. (N.T. 6/19/19 at 394). She stated that since she was six months pregnant at the time, she couldn't carry T.S. anymore, so she called 9-1-1 from the location where the officers responded. (N.T. 6/19/19 at 394). When Officer Wittmer asked Appellant what brought her to this area, she stated that she was there to see someone, but she could not provide a name or phone number. (N.T. 3/19/19 at 381-382). When Officer Wittmer asked her for T.S.'s father's name, she said she did not know it and that she did not have his phone number. (N.T. 3/19/19 at 382). When Officer Levy asked Appellant what brought her to this area, she stated she was going to visit her boyfriend, Mark Johnson, but could not give the officer an address or a phone number to where she was headed. (N.T. 6/19/19 at 394). When Officer Levy asked her about Mark Johnson again a few minutes later, Appellant told him that he was not her boyfriend, but was T.S.'s father and the father of the child she was carrying. (N.T. 6/19/19 at 397). Officer Levy then learned that T.S. was deceased. *(N.T. 6/19/19 at 397).* He detained Appellant and transported her to the Abington Police Station. (N.T. 6/19/19 at 397-398).

At the Police Station on January 22, 2018, Detective Donald Lindenmuth, of the Abington Township Police Department, interviewed Appellant. Initially, Appellant provided an oral statement to the police, but that statement was ultimately suppressed as a violation of *Miranda*.[6] Following her oral statement, Detective provided Appellant with her *Miranda* rights, and

---

A discussion of the Suppression ruling is discussed in detail later in this Opinion.

she gave a voluntary written statement to the Detective. Appellant signed her constitutional rights form, and gave a statement to Detective Lindenmuth. (N.T. 6/19/19 at 404-407). She told the Detective in a narrative form about the abuse she inflicted on T.S. throughout that day that ultimately led to his death. (N.T. 6/19/19 at 416-430).

Detective Sergeant Richard Kondan, of the Abington Township Police Department, responded to King's home and spoke with him there. (N.T. 6/18/19 at 174-175). King first told Detective Kondan that Appellant and T.S. were not at his house on January 22, 2018. (N.T. 6/18/19 at 176). Detective Kondan told King that T.S. had passed away. He asked King if he would come to the police station to talk about the incident, and King readily agreed. (N.T. 6/18/19 at 177). King was transported to the Abington Police Station and he spoke with Detective Kondan and Detective Wilsbach. (N.T. 6/18/19 at178). At approximately 8:25 PM, Detectives took King into custody. (N.T. 6/18/19 at 186). On January 23, 2018, at approximately 9:49 AM, King was given his *Miranda* rights, he signed his constitutional rights form, and gave a statement to Detective Todd Richard, of the Montgomery County Detective Bureau. (N.T. 6/18/19 at 208-211). He told Detective Richard about the abuse he inflicted upon T.S. in the past, specifically that he had struck T.S. in the back with a belt about five (5) months prior to his death. (N.T. 6/18/19 at 224). He admitted to the abuse he inflicted upon T.S. throughout the day on January 22, 2018, which ultimately led to his death.

Dr. Ian Hood performed an autopsy on T.S. on January 23, 2018. Dr. Hood is the medical examiner of Burlington County, New Jersey, and he performs autopsies in Bucks and Montgomery Counties in Pennsylvania. (N.T. 6/18/19 at 73-74). The autopsy of T.S. showed repeated, intentional acts of abuse. T.S.'s external injuries included profuse swelling and bruising on the back of the buttocks with a distinct pattern that matched the sole of the flip that that was used to beat him. (N.T. 6/18/19 at 82, 91-93, Exhibit C-12, Exhibit C-15). The beating of his buttocks was so severe that it caused the tissue underneath to pulpify. (N.T. 6/18/19 at 93-95, 96, Exhibit C-16). T.S. was beaten so hard that he suffered from "crush syndrome," which is the type of injury sustained as a result of building collapse. (N.T. 6/18/19 at 96-97). The toxic component of cells were released into his bloodstream and eventually caused shock, organ damage and death. (N.T. 6/18/19 at 96-97, 99-100).

In addition to the injuries on his buttocks, T.S. had redness, swelling, blistering, and skin slippage across his upper back, which was the result of a mixture of fresh first, second, and third degree burns. (N.T. 6/18/19 at 84). T.S. also had bruising around both of his ears. (N.T. 6/18/19 at 88, 93-94, 103, Exhibits C-18 and C-19)). The autopsy revealed significant head injury. Specifically, T.S. sustained bruises on the back of each side of his brain, evidencing that both ears had been hit with force and that his head was rocking backwards and forwards. (N.T. 6/18/19 at 107-108).

The autopsy also revealed that T.S. had two large and irregular old scars on his central upper back, one of which was a solid shape consistent with

12

being hit with an object such as an adult belt buckle. (N.T. 6/18/19 at 83-84). The scars were the result of injuries that had been caused at least a few months before the date of the autopsy. (N.T. 6/18/19 at 84). The autopsy also revealed eleven old rib fractures. Two of the rib fractures were displaced, which means the bone was actually separated and adhered to his lung at autopsy. The rib injuries were caused over multiple incidents because there is no way a child could absorb eleven rib fractures at once without being hospitalized. (N.T. 6/18/19 at 103-105). These rib injuries were corroborated by three witnesses: Zakiyyah Holly saw bruises in the back and rib area in the summer of 2017; August Pauline said T.S. complained of pain in his side in the summer of 2017; and Anthony Cross said T.S. complained of pain in his side and rib area in summer of 2017.

Dr. Hood stated that in the last one to two hours of his life, T.S. would have been drowsy, unarousable, unable to talk in complete sentences, and harder to rouse as time passed. (N.T. 6/18/19 at 109) This is consistent with what Appellant and King observed. T.S.'s cause of death was multiple blunt and thermal injuries and shock, which was the culmination of a day of progressive punishments, beatings, and abuse. (N.T. 6/18/19 at 110). The manner of death was homicide. (N.T. 6/18/19 at 110).

## **Issues**

Appellant raises the following issues in her Concise Statement of Matters Complained of on Appeal:

13

1. THE TRIAL COURT ERRED IN NOT SUPPRESSING MS. SMITH'S WRITTEN STATEMENT. *SEE* ORDER FILED OF RECORD 08/10/2018. SPECIFICALLY, MS. SMITH'S STATEMENT TO THE POLICE WAS IN VIOLATION OF *MIRANDA* AND IT WAS INVOLUNTARY. *SEE* OMNIBUS PRE-TRIAL MOTION FILED 06/28/18, PP. 6-10.

2. THE TRIAL COURT ERRED IN ADMITTING MR. KING'S STATEMENT IN VIOLATION OF *BRUTON V. U.S.* 391 U.S. 123 (1968). MR. KING'S REDACTED STATEMENT MADE NUMEROUS REFERENCES TO MS. SMITH THAT WERE PREJUDICIAL TO MS. SMITH AND VIOLATED MS. SMITH'S SIXTH AMENDMENT RIGHT TO CONFRONT HER ACCUSERS. *SEE* N.T. 06/18/19 "JURY TRIAL-VOL. I," PP. 213-227.

3. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT MS. SMITH OF EITHER 18 PA.C.S. § 2502(a) MURDER OF THE FIRST DEGREE OR 18 PA.C.S. 903(a)(1) CRIMINAL CONSPIRACY TO COMMIT MURDER OF THE FIRST DEGREE. MURDER OF THE FIRST DEGREE IS DEFINED AS AN "INTENTIONAL KILLING." SIMILARLY, CRIMINAL CONSPIRACY REQUIRES THE "INTENT OF PROMOTING OR FACILITATING" THE COMMISSION OF THE UNDERLYING CRIME. THUS, BOTH CRIMES REQUIRE SUFFICIENT PROOF THAT MS. SMITH HAD THE SPECIFIC INTENT TO KILL [T.S.]. THERE WAS INSUFFICIENT EVIDENCE THAT MS. SMITH HAD THE SPECIFIC INTENT TO KILL.

## Discussion

The first issue Appellant raises on appeal is related to this court's suppression ruling on August 10, 2018. Defendant filed a Motion to Suppress Statements on June 28, 2018. The Commonwealth filed an Answer and Response on August 1, 2018. Following testimony and argument on August 2, 2018, this court issued written findings on August 10, 2018 granting in part and denying in part Appellant's Motion to Suppress Statements. Appellant

14

claims in this appeal that her written statement to police was involuntary and in violation of *Miranda* and therefore should have been suppressed.

The factual basis for suppression is as follows. Appellant first encountered police officers from Abington Township at approximately 6:17 p.m. at the corner Coolidge and Columbia Avenues, the location from where she called 9-1-1. At the scene, Officers Wittmer and Levy spoke with Appellant. Appellant was not in custody when she initially spoke with Officer Wittmer and Officer Levy at the scene.

Once Officer Levy learned that T.S. was deceased, he detained Appellant at the scene and transported her to the Abington Police Station in his patrol car. They arrived at the police station at approximately 6:53 p.m. When they arrived there, Appellant was taken to an interview room where she encountered Detectives Donald Lindenmuth and Richard Beaghley of the Abington Police Department. The interview room was approximately 10x10 feet and included a table, several chairs, a window, and a desk with a computer. The Detectives were dressed in plain clothes. The Detectives asked Appellant if she was willing to make a statement. She said yes. Appellant was not given *Miranda* warnings at this time. Appellant provided a voluntary, oral statement to Detectives, stating that she picked up T.S. in Philadelphia from Mark Johnson and noticed that T.S. was not acting right. She further stated that they took the bus to the Willow Grove Park Mall, but T.S. was having trouble walking. She suspected he was having an asthma attack and called 9-1-1.

15

The failure to administer *Miranda* warnings at this time was based on the Detectives' lack of awareness of the fact that Officer Levy placed Appellant into custody at the scene. The Detectives did not deliberately avoid giving *Miranda* warnings in order to manipulate the situation or induce Appellant into giving a statement.

During the course of Appellant's oral statement, Detectives received information related to the investigation of T.S.'s death. Specifically, at 7:50 p.m. Detectives learned from a witness that Appellant and T.S. were at 1843 Lukens Avenue all day on January 22, 2018. This information was contrary to what Appellant had just told them. Upon learning this information, Detective Lindenmuth advised Appellant that they knew she was not in Philadelphia that day, upon which Appellant started crying, acknowledged that she was at 1843 Lukens Avenue, and made a general comment about T.S. being punished. At this point, Detectives ceased all questioning of Appellant. After speaking with other Detectives investigating the case, at approximately 8:57 p.m., Detectives Lindenmuth and Beaghley informed Appellant of her *Miranda* rights before she continued with her statement. Appellant acknowledged and voluntarily waived her rights under *Miranda* and agreed to provide a written statement to Detectives.

Before taking her written statement, Detective Lindenmuth read Appellant her *Miranda* rights a second time, which was memorialized in writing on the first page of her written statement. Appellant signed her name directly under the enumerated rights and proceeded to give a voluntary written

16

statement to police. At approximately 9:00 p.m., prior to beginning the statement, Appellant was offered food or drink, and was given what she requested. The written statement was in the format of written questions and answers; however, after being asked a few questions Appellant offered a detailed narrative of the events of January 22, 2018. The Detectives typed her narrative as she provided it, and Detectives did not interrupt her. Appellant provided none of this detailed information in her *pre-Miranda* statement to Detectives. Detectives completed their questioning at approximately 11:45 p.m. Appellant gave a ten (10) page statement. After the statement was completed, Detective Lindenmuth printed a copy of the written statement and gave it to Appellant to review. She made one correction to the statement, adding a fact to one of her answers, and signed and dated each page. Appellant's *post-Miranda* statement contradicted most of her *pre-Miranda* statement. After giving her statement, one of the Detectives offered Appellant the opportunity to adopt her statement on video. Appellant voluntarily declined consent for a video recording of her statement. The police complied with her decision not to allow a videotaped statement to be made.

Although Appellant's oral statements to the Detectives were made voluntarily, she was in custody at the time and was not given *Miranda* warnings. As a result, this court granted Appellant's Motion to Suppress Statements with respect to her oral statement and suppressed all statements made from the time she was first questioned by Detectives Lindenmuth and Beaghley in the interview room at the Abington Police Station, up until the time

17

she was given her *Miranda* warnings. The court denied Appellants Motion to Suppress Statements with respect to her written statement which was provided voluntarily following *Miranda* warnings.

The procedural safeguards of *Miranda* are required only where a suspect is both taken into custody and subjected to interrogation. A person is in custody for Miranda purposes when she is physically denied her freedom of action in any significant way or is placed in a situation in which she reasonably believes that her freedom of action or movement is restricted by the interrogation. *Commonwealth v. Yandamri*, 639 Pa. 100, 127-28 (2017). The test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. *Interest of N.M.,* 2019 Pa. Super. 330, --A.3d (2019). Rather, the test focuses on whether the individual being interrogated reasonably believes her freedom of action is being restricted. *Id.* Whether an encounter is deemed custodial must be determined by examining the totality of the circumstances. *Yandamuri*, 639 Pa. at 127-28 Statements not made in response to custodial interrogation are classified as gratuitous and not subject to suppression for lack of *Miranda* warnings. *Id.*

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise her free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. *In Interest of N.M.,* 2019 Pa. Super. at 8 (citing *Oregon v. Elstad*, 470 U.S. 298, 309

18

(1985)). Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made. ***Oregon v. Elstad***, 470 U.S. at 318. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. ***Id.*** As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of her statements. ***Id.*** No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. ***Id.*** A suspect who has once responded to unwarned yet uncoerced questioning is not disabled from waiving her rights and confessing after she has been given the requisite *Miranda* warnings. ***Id.***

When a defendant alleges that a confession was involuntary, the inquiry becomes not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of her ability to make a free and unconstrained decision to confess. ***Yandamuri***, 639 Pa. at 135-136. The voluntariness of a confession is determined from a review of the totality of the circumstances surrounding the confession.

In assessing voluntariness, a court should consider: the duration and means of the interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and all other factors that could drain a person's

ability to resist suggestion and coercion. *Id.* (citing **Commonwealth v. Perez,** 577 Pa. 360, 845 A.2d 779, 787 (2004)). Additional relevant factors include: the accused's age and level of education and experience; his extent of previous experience with the police; whether the accused was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep or medical attention, and whether he was abused or threatened with abuse. *Id.* at 136.

Detective Lindenmuth's initial failure to administer *Miranda* warnings to Appellant prior to her oral statement was not intentionally done to avoid giving *Miranda* warnings or to coerce or undermine Appellant's ability to exercise her free will. Rather, it was based on a lack of awareness that Officer Levy placed Appellant in custody. There was no evidence to suggest the Detective Lindenmuth deliberately used coercive or improper tactics in obtaining Appellant's *pre-Miranda* statement. By carefully and thoroughly administering *Miranda* warnings prior to her written statement, Detective Lindenmuth cured the condition that rendered the unwarned statement inadmissible. The investigatory process did not taint Appellant's *post-Miranda* written statement.

At all times during the written statement, the Detectives spoke in conversational tones and never raised their voice. The Detectives made no threats or promises to Appellant. The Detectives never brandished their firearms. Detectives permitted Appellant to move freely about the interview room. At times Appellant asked to sit or lay on the floor for comfort. When she was on the floor, the detective speaking to her got down on the floor as well.

20

When Appellant cried, they offered her tissues for comfort. She was provided food and drink when she asked. When Appellant complained of pain or discomfort, which occurred several times, the Detectives asked if she wanted medical attention. Each time she responded that she did not.[7] At no point was she handcuffed or otherwise restrained within the interview room. Appellant never asked to speak with an attorney and never exercised her right to remain silent. A reasonable person would conclude that Appellant understood her constitutional rights and that her decision to waive them was a deliberate choice.

The totality of the circumstances show that Appellant knowingly, intelligently and voluntarily waived her rights under *Miranda* and provided a voluntary written statement to Detectives. Her statement to the Detectives reveals an independent choice and the requisite level of comprehension to support the conclusion that she knowingly waived her *Miranda* rights and made a voluntary confession. There is no evidence that the interrogation was manipulative or coercive or that it deprived Appellant of her ability to make a free and unconstrained decision to confess. As a result, the trial court's suppression rulings should be affirmed by the Superior Court.

Appellant's next claim of error on appeal is that the trial court erred in admitting co-defendant King's statement to police as it was in violation of

---

[7] Following the written statement and just before she was placed in a holding cell, Appellant complained of pain in her abdomen. Police asked if she wanted medical attention, and this time she said she did. Appellant was transported to Abington Hospital at approximately 12:46 a.m. She was evaluated at the Hospital. At approximately 3:04 a.m. she was medically cleared and returned to the police station.

*Bruton v. U.S.*, 391 U.S. 123 (1968). Appellant claims that King's redacted statement made numerous references to her that were prejudicial and violated her sixth amendment right to confront her accusers.

King provided a written statement to Detective Todd Richard at the Abington Police Department on January 23, 2018. Detective Richard testified at trial and read a redacted version of King's statement. (N.T. 6/18/19 at 213, Exhibit C-53). The statement was redacted so that any reference to Appellant or any other person engaging in criminal conduct was removed. Defense counsel objected to the admission of the redacted statement arguing that it was in violation of *Bruton*. The court overruled the objection.

In *Bruton v. United States*[8] the United States Supreme Court held that a violation of the confrontation clause occurs when a non-testifying co-defendant's admission inculpating the defendant is introduced at a joint trial. However, if the statement is redacted to remove any specific references to the defendant, and a proper limiting instruction is given to the jury, a violation does not occur. ***See Richardson v. Marsh***, 481 U.S. 200 (1987). If a confession can be edited so that it retains its narrative integrity and yet does not contain a hint of participation in the crime by the defendant, the use of it does not violate the principles of *Bruton*, even though the confession serves to implicate the defendant as a participant in the crime or crimes charged when linked with other evidence presented at trial. ***Commonwealth v. Rainey***, 593 Pa. 67, 928 A.2d 215, 226-227 (2007); ***Commonwealth v. James***, 66 A.3d 771

---

[8] 391 U.S. 123 (1968).

22

(2013). Although prejudice may arise when a co-defendant's redacted confession referring to the defendant by "contextual implication" is introduced in a joint trial, this danger merely requires that the trial and reviewing courts balance the potential prejudice to the defendant versus the probative value of the evidence, the possibility of minimizing the prejudice, and the benefits to the criminal justice system of conducting joint trials. *Rainey*, 928 A.2d at 227-228.

The redacted statement in this case did not violate *Bruton*. Prior to the admission of King's statement, the defense had an opportunity to review the Commonwealth's proposed redactions, and the court made some additional redactions to ensure that any reference that could implicate Appellant in the alleged criminal conduct was removed. (N.T. 6/18/19 at 137-141). There was no suggestion in the redacted statement of another person engaging in criminal conduct. When Detective Richard testified, he read King's redacted statement verbatim, and the statement was admitted into evidence. The redacted statement only referenced criminal conduct related to King. The statement as read gave no suggestion of another person engaging in criminal conduct. The statement only referenced Appellant as being King's girlfriend and pregnant with his child, and that she was at King's house on January 22, 2018 and she fed the kids that morning. The information in the statement relating to the abuse inflicted upon T.S., the burns inflicted on him in the shower, and T.S.'s demeanor after the shower, was related to co-defendant King only. The statement read clearly and smoothly, and it retained its narrative integrity

despite the redactions. There was no prejudice to the Appellant in admitting King's statement as evidence against him.

In addition, the court provided a cautionary instruction to the jury prior to the admission of the statement, and again during its closing charge. (N.T. 6/18/19 at 212-213). Before Detective Richard read the statement, the court gave the following cautionary instruction to the jury:

> "Ladies and gentlemen, you're about to hear a statement that was made by Keiff King the defendant. There is a rule that restricts the use by you of the evidence offered to show that the defendant Keiff King made a statement concerning the crimes charged. A statement made before trial may be considered as evidence only against the defendant who made that statement. So you can consider the statement that you are about to hear as evidence against Defendant Keiff King if you believe he made the statement voluntarily. You may not and you must not consider the statement as evidence against Defendant Lisa Smith. So I am telling you as a matter of law, you must not use the statement in any way against Lisa Smith." (N.T. 6/18/19 at 212-213).

The court's also gave a cautionary instruction to the jury in its closing charge reiterating this information. (N.T. 6/20/19 at 765-771). The court did not err in admitting King's redacted statement at trial.

Appellant's third claim of error is related to the sufficiency of the evidence for the crimes of First Degree Murder and Conspiracy to Commit First Degree Murder.10 Appellant claims that there was insufficient evidence at trial to prove that she possessed specific intent to kill T.S., which is a required element of each crime.

---

[9] 18 Pa.C.S.$ 2502(a).
[10] 18Pa.C.S.$ 903(a)(1).

24

In reviewing the sufficiency of the evidence, the Superior Court must determine whether the evidence admitted at trial, and all the reasonable inferences derived therefrom, viewed in favor of the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Le,* 208 A.3d 960, 969 (Pa. 2019) (citing *Commonwealth v. Smith,* 604 Pa. 126, 985 A.2d 886, 894-95 (2009)). First-degree murder is an intentional killing, *i.e.,* a "willful, deliberate and premeditated killing." *18 Pa.C.S. § 2502(a), (d).*

It is well-established that the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence and the jury, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence. *Commonwealth v. Yandamuri,* 639 Pa. 100, 118-19, 159 A.3d 503, 514 (2017) (citing *Commonwealth v. Poplawski,* 130 A.3d 697, 709 (Pa. 2015)).

In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to **kill.** *Le,* 208 A.3d at 969 (citing *Smith,* 985 A.2d at 895). In order to prove Conspiracy to commit first degree murder, the Commonwealth must establish that: **(1)** the defendant intended to commit or aid in the commission of the criminal act; (2) that the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. *Id.* As it is often difficult to

25

prove an explicit or formal agreement, the agreement generally is established via circumstantial evidence, such as by the relations, conduct, or circumstances of the parties, or the overt acts on the part of co-conspirators. *Id.* (citing *Commonwealth v. Johnson*, 604 Pa. 176, 985 A.2d 915, 920 (2009)). In the case of a conspiracy to commit homicide, each member of the conspiracy may be convicted of first-degree murder, regardless of who inflicted the fatal wound. *Id.*

A specific intent to kill may be proven by circumstantial evidence and can be inferred from the defendant's use of deadly force upon a vital part of the victim's body. *Id.* Where a defendant knowingly applies deadly force to the victim, his specific intent to kill is as evident as if he expressed the intent to kill at the time the force was applied. *Commonwealth v. Shank*, 883 A.2d 658, 664-65 (Pa. Super. 2005). In this context, the extent to which force may be deemed "deadly" is not merely a function of whether the defendant used a weapon, but rather, may be gauged by other factors including the seriousness and type of injury inflicted. *Id.* With respect to child abuse cases, the Pennsylvania Supreme Court has specifically held that evidence is sufficient to sustain conviction for first degree murder even where the medical evidence does not point to a "final incident" or "final blow" which was the definitive cause of death. *Commonwealth v. Powell*, 956 A.2d 406, 415 (Pa. 2008).

An individual can be held criminally liable for the acts of another, including first-degree murder, as an accomplice. In order to sustain a conviction based on accomplice liability, the Commonwealth must demonstrate

26

that an individual acted with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. *Le*, 208 A.3d at 969 (citing *Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 585-86 (1998)). As with conspiracy, a shared criminal intent between the principal and his accomplice may be inferred from a defendant's words or conduct or from the attendant circumstances. *Id.*

The Commonwealth presented sufficient evidence at trial to support Appellant's conviction for first degree murder of T.S. and conspiracy to commit first degree murder. When viewed in the light most favorable to the Commonwealth as verdict winner, the evidence established that Appellant engaged in consistent and repeated physical abuse of T.S., which resulted in his death, and she failed to call for help when T.S. exhibited signs of distress on January 22, 2018.

The evidence presented established that Appellant engaged in a pattern of abuse over a number of months prior to T.S.'s death. At the time of his death, the autopsy revealed that T.S. had multiple scars on his back consistent with full thickness skin loss and consistent with being hit with a belt prior to the events inflicted on the day of his death. In addition, he had ten old rib fractures. Four witnesses, Holly, B. Pauline, A. Pauline, and Cross, corroborated these injuries. The consistent abuse ultimately culminated in T.S.'s death on January 22, 2018 after a day of repeated beatings and abuse. This repeated abuse showed hardness of heart and malice.

27

The evidence showed that the beatings and abuse Appellant and her co-defendant inflicted on T.S. on January 22, 2018 included burns to T.S.'s shoulder, where his skin was blistered and raw, and extensive bruising on his buttocks. T.S. did not just endure surface bruising on his buttocks. He suffered extensive internal injuries associated with the bruising on his buttocks. As Dr. Hood testified, the hemorrhage went from the surface of the skin all the way to the muscle underneath. The fat tissue underneath his buttocks was partially pulpified. This type of injury is consistent with being crushed as a result of a building collapse. The amount of force Appellant and her co-defendant used when beating T.S. was enough to crush his insides. As evidenced by the photographs, the sole of the flip flop they used to beat him was imprinted on his buttocks. They violently and viciously struck this innocent four year old as hard as they could, over and over again. T.S. was merely four (4) years old and forty-two (42) pounds. Appellant and King subjected him to prolonged malicious torture and ultimately killed him in an attack of such ferocity that Dr. Hood likened his injuries and impact upon his body to having been crushed as if from a building collapse. From those facts, intent to kill can be inferred.

Intent becomes more clear when T.S. began to decline and show distress. After the shower T.S. was unable to get out of the tub. He could not get dressed. Appellant described him as laying on the bathroom floor with a stuck face. He could not hold his head up straight. As T.S. was laying on the couch like he was going to sleep, King believed that he was just being "dramatic."

28

When Appellant returned to the living room approximately five (5) minutes later to check on T.S., she found him on the floor next to the sofa. T.S. could not move back onto the couch. Appellant observed that T.S.'s lips were moving weird, and she could see in his eyes that he was going out. King observed this as well. At this point, Appellant and King both knew that T.S. was in distress and that something was wrong. As T.S. was clearly exhibiting signs of distress, neither Appellant nor King called 9-1-1 for immediate help.

Instead, Appellant called Holly asking her for an Uber or a Lyft ride. Holly replied that she did not have one. King called his Aunt Cheryl to see if she could come to the house, but she was twenty (20) minutes away. Still declining to call 9-1-1, Appellant and King put a coat on T.S., and Appellant left the house holding T.S. She began to walk to remove herself and the child from Appellant's house where the crime occurred. Appellant stated that ten (10) to fifteen (15) minutes had passed from the time she knew T.S. was in distress by the way his lips were moving until she left the house. Appellant did not call 9-1-1 until she reached the corner of Coolidge and Columbia in Willow Grove. At this point, T.S. was already deceased.

Appellant and her co-defendant clothed an unconscious or deceased body and then they planned and executed a cover-up story. They put a coat on T.S. to corroborate their story that Appellant was coming from Philadelphia. Appellant walked to an intersection to call 9-1-1, to make it look as if she had taken a bus to Willow Grove from Philadelphia, gotten off at the mall, and walked across the parking lot through an opening in the fence. Both she and

29

King knew this route because this is how she would get to his house when she stayed with him.[11]   Appellant handed the paramedics a dead child, and never asked any police officer or medical personnel about T.S.'s condition.  She knew he was dead.

King corroborates Appellant's lie when he told Detective Kondan that neither Appellant nor T.S. were not at his house that day.  King told Detective Kondan that when Appellant and T.S. would come to his house on Lukens Avenue, Appellant used public transportation to get to Willow Grove and then cut through the parking lot and the opening in the fence to get to Lukens Avenue.  King repeatedly stated that the only adults in the house on January 22, 2018 were his cousin and his grandmother.  That was a lie.  Appellant and King were there all day.

Appellant's consciousness of guilt also supports the evidence of specific intent in this case.  Appellant removed T.S. from the home, the scene of his death, before she or her co-defendant called for emergency help.  This evidence of concealment demonstrates consciousness of guilt.  In addition, Appellant and her co-defendant each made false statements to the police when questioned.  Their statements were consistent; their cover up was planned.  This is also evidence of Appellant's consciousness of guilt.

The evidence shows that Appellant repeatedly chose King over T.S. in the months leading up to T.S.'s murder. Friends and family approached Appellant regarding the suspected abuse inflicted upon T.S. They offered to help and care

N.T. 6/18/19 at 181-182.

30

for her and T.S., she continued to choose King. The evidence demonstrates that Appellant and King acted together throughout the day on January 22, 2018 to punish and abuse T.S. Their joint actions and omissions facilitated and caused T.S.'s death. The evidence presented in this case shows that Appellant and King acted in concert every step of the way.

Based on the totality of these facts, including the severity of the injuries, the repeated and consistent beatings and abuse prior to the day of the murder and throughout the entire day on January 22, 2018, the failure to call for help when T.S. was in distress, and the concoction of their cover-up story, the evidence shows that Appellant was responsible for T.S.'s killing, that she conspired with King to effectuate the killing, and that she acted with malice and the specific intent to kill T.S.

## CONCLUSION

Based on the foregoing, Appellant's judgment of sentence, imposed on July 31, 2019, should be affirmed by the Superior Court.

BY THE COURT:

RISA VETRI FERMAN, J.

Copies of Opinion sent on 2/10/too to:
Robert M. Falin, Chief, Appeals Division, District Attorney's Office
Victoria Kessler, District Attorney's Office
Kayla Witherite, District Attorney's Office
Lee Awbrey, Esquire - Defense Attorney
Court Administration - Criminal Division

31